**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CONRAD M. BLACK, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No. 1:12-cv-4306 |
| v. | ) | |
| | ) | Original Crim. Case No. 05 CR 727 |
| UNITED STATES, | ) | Judge: AMY ST. EVE |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO
VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255
OR, IN THE ALTERNATIVE, FOR A WRIT OF ERROR CORAM NOBIS**

Baker & Hostetler LLP

William K. Kane
191 North Wacker Drive
Chicago, Illinois 60606-1901
Telephone: (312) 416-6200
Facsimile: (312) 416-6201

Marc D. Powers
John W. Moscow
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

# TABLE OF CONTENTS

**Page**

INTRODUCTION .............................................................................................................1

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ................................................................................................6

I.     MR. BLACK RETAINS WILLIAMS & CONNOLLY IN CONNECTION WITH THE PRE-INDICTMENT CRIMINAL INVESTIGATION ............................................6

II.    MR. BLACK CONTRACTS TO SELL HIS MANHATTAN  APARTMENT TO PAY WILLIAMS & CONNOLLY'S PROJECTED TRIAL RETAINER ......................7

III.   THE GOVERNMENT USES A MISLEADING AFFIDAVIT TO OBTAIN A DEFECTIVE WARRANT AND SEIZE THE APARTMENT PROCEEDS WHILE CONTEMPLATING FURTHER SEIZURES ......................................................9

IV.   WILLIAMS & CONNOLLY ALERTS THE GOVERNMENT TO THE FACTUAL INACCURACIES UNDERLYING THE SEIZURE AND TO THE FACT THAT THE SEIZURE IMPLICATES MR. BLACK'S RIGHT TO COUNSEL OF CHOICE ...............................................................................................10

V.    THE GOVERNMENT KNOWINGLY FILES AN UNSUPPORTED INDICTMENT AGAINST MR. BLACK IN ORDER TO AVOID ANSWERING THE CHALLENGE TO THE CONSTITUTIONALITY OF THE SEIZURE ...............12

VI.   THE GOVERNMENT'S SEIZURE OF THE APARTMENT PROCEEDS TERMINATE MR. BLACK'S ABILITY TO RETAIN COUNSEL OF CHOICE IN THE CRIMINAL ACTION ...................................................................................12

VII.  MR. BLACK IS ACQUITTED OF ALL BUT FOUR COUNTS AND THE GOVERNMENT FAILS TO MEET EVEN THE CIVIL STANDARD NECESSARY TO OBTAIN A FORFEITURE ORDER .................................................13

VIII. MANIFEST ERRORS AND OMISSIONS IN THE COLEMAN AFFIDAVIT ALLOW THE GOVERNMENT TO SEIZE MR. BLACK'S PROPERTY IMPROPERLY ...............................................................................................................14

      A.    Factual Background Regarding Manhattan Apartment ........................14

      B.    The Coleman Affidavit Included Materially False Statements and Omitted Essential Information ...............................................................................17

            1.    The Coleman Affidavit Inaccurately Represented the Nature of the Interests in the 1994 Agreement and 2000 Transaction and the $3 Million Agreed Value of the Manhattan Apartment ..................................18

            2.    Special Agent Coleman Excluded a Memorandum Purporting to Impartially Establish the Fair Market Value of the Manhattan Apartment as $3 Million ....................................................................................22

            3.    Special Agent Coleman Misidentified the Sullivan & Cromwell Client Trust Account ...............................................................................24

# TABLE OF CONTENTS
(continued)

**Page**

IX.  THE GOVERNMENT INTENTIONALLY FILED BASELESS FORFEITURE COUNTS AFTER BEING PRESENTED WITH DETAILS OF THE 2000 TRANSACTION BY WILLIAMS & CONNOLLY ██████████ ████████████ ..........................................24

X.   THE GOVERNMENT'S ACTIONS DEPRIVED MR. BLACK OF HIS CONSTITUTIONAL RIGHT TO BE REPRESENTED BY COUNSEL OF CHOICE ..................................................................................25

ARGUMENT ..........................................................................................26

I.   STANDARD FOR RELIEF ...............................................................26

II.  THE GOVERNMENT'S SEIZURE OF THE APARTMENT PROCEEDS AND SUBSEQUENT INDICTMENT DEPRIVED MR. BLACK OF HIS COUNSEL OF CHOICE IN VIOLATION OF THE SIXTH AMENDMENT ..................28

    A.  Scope of the Sixth Amendment Right to Counsel ................................28

    B.  Absent Probable Cause, Forfeiture Of Assets A Defendant Intends To Use To Retain Counsel Is Not Proper ...........................................30

    C.  The Government May Not Use Improper Means to Deprive a Defendant of Legitimately-Available Funds Intended for the Payment of Counsel of Choice .....................................................................32

    D.  The Government Violated Mr. Black's Sixth Amendment Rights by Depriving him of his Property Without a Basis in Order to Foreclose his Ability to Hire Counsel of Choice ......................................34

III. THE SEIZURE OF THE APARTMENT PROCEEDS USING A DEFECTIVE AFFIDAVIT VIOLATES THE FOURTH AMENDMENT ............................36

    A.  The Standard for Determining the Adequacy of a Warrant .....................37

    B.  The Coleman Affidavit and the Seizure Warrants are Invalid as a Result of Special Agent Coleman's Reckless and/or Intentional Material Misstatements and Omissions of Fact ...........................................39

        1.  The Coleman Affidavit's False Allegations ..............................39

        2.  The Coleman Affidavit Contained Several Mistakes of Fact that Were Apparent From the Face of the 1994 and 2000 Transfer Agreements .....................................................41

        3.  Special Agent Coleman Had Access to but Failed to Consider the Healy Memorandum Which Further Negated Any Criminal Intent ........43

        4.  Flawed Calculations Led to the Restraint of Far More Money Than Authorized by Statute .....................................................44

**TABLE OF CONTENTS**
(continued)

C.    The Material Misstatements and Omissions in the Coleman Affidavit Deprived Mr. Black of his Fourth Amendment Right Not to Be Deprived of Property Absent Probable Cause ................................................................... 46

IV.    THE GOVERNMENT'S CONDUCT FROM SEIZURE TO INDICTMENT DEPRIVED MR. BLACK OF HIS FIFTH AMENDMENT RIGHT TO DUE PROCESS OF LAW ................................................................................. 49

███████████████████████████████████████████████████ ..................... 53

B.    The Government Wrongfully Neglected to Correct Material Omissions and Misstatements of Facts Present in the Coleman Affidavit in Violation of its Constitutional Duties Under the Fifth Amendment .................................... 54

C.    The Government Abused the Presumption of Regularity in Filing the Indictment ................................................................................................ 56

D.    The Government Committed Misconduct by Strategically Filing an Indictment Against Mr. Black on Unsupported Criminal Charges in Order to Retain his Funds ....................................................................................... 57

E.    This Prosecutorial Misconduct in Violation of the Fifth Amendment Directly Resulted in a Violation of the Sixth Amendment Right to Counsel of Choice ....................................................................................................... 61

V.    PRAYER FOR RELIEF / CONCLUSION ................................................... 62

# TABLE OF AUTHORITIES

**Page(s)**

Cases

Agurs v. United States,
427 U.S. 97 (1976) ................................................................. 54

Berger v. United States,
295 U.S. 78 (1935) ................................................. 1, 30, 58, 61

Black v. United States,
130 S.Ct. 2963 (2010) ...................................................... 14, 18

Black v. United States,
131 S.Ct. 2932 (2011) .............................................................. 14

Boyer v. United States,
55 F.3d 296 (7th Cir. 1995) .................................................... 26

Brady v. Maryland,
373 U.S. 83 (1963) .................................................................. 54

California v. Trombetta,
467 U.S. 479 (1984) ........................................................... 57, 62

Caplin & Drysdale, Chartered, v. United States,
491 U.S. 617 (1989) ............................................ 28, 49, 50, 51

Carafas v. Lavallee,
391 U.S. 234 (1968) ................................................................ 27

Chaidez v. United States,
655 F.3d 684 (7th Cir. 2011) .................................................. 26

Darden v. Wainright,
477 U.S. 168 (1986) ................................................................ 61

DeLoach v. Bevers,
922 F.2d 618 (10th Cir. 1990) ............................................... 39

Emery v. American Gen. Fin., Inc.,
71 F.3d 1343 (7th Cir. 1995) .................................................. 43

Franks v. Delaware,
438 U.S. 154 (1978) ........................................................... 37, 38

Hale v. Fish,
899 F.2d 390 (5th Cir. 1990) .................................................. 39

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Hays v. United States,*
    397 F.3d 564 (7th Cir. 2005) ....................................................................26

*Interstate Cigar Co. v. United States,*
    928 F.2d 221 (7th Cir. 1991) ...................................................................59

*Kusay v. United States,*
    62 F.3d 192 (7th Cir. 1995) .....................................................................27

*Kyles v. Whitley,*
    514 U.S. 419 (1995) ................................................................................55

*Marine Midland Bank, N.A., v. United States,*
    11 F.3d 1119 (2d Cir. 1993) ....................................................................37

*Molina v. Cooper,*
    325 F.3d 963 (7th Cir. 2003) ...................................................................38

*Napue v. Illinois,*
    360 U.S. 264 (1959) ................................................................................55

*Pointer v. United States,*
    No. 03 C 1433, 2004 WL 524720 (N.D. Ill. Mar. 11, 2004) ....................26

*Rivera v. United States,*
    928 F.2d 592 (2d Cir. 1991) ....................................................................38

*Securities and Exchange Commission v. Black, et al.,*
    Civil Action No. 04C7377 (N.D. Ill. Nov. 15, 2004) ...............................27

*Stoia v. United States,*
    22 F.3d 766 (7th Cir. 1994) .....................................................................26

*In re United States,*
    503 F.3d 638 (7th Cir. 2007) ...................................................................60

*United States el rel. Ferenc v. Brierley,*
    320 F. Supp. 406 (E.D. Pa. 1970) ............................................................50

*United States v. 122,942 Shares of Common Stock of Firstrock Bancorp, Inc.,*
    847 F. Supp. 105 (N.D. Ill. 1994) ............................................................45

*United States v. Bissell,*
    866 F.2d 1343 (11th Cir. 1989) .......................................................50, 51, 52

*United States v. Black,*
    625 F.3d 386 (7th Cir. 2010) ...................................................................14

**TABLE OF AUTHORITIES**
(continued)

<u>Page(s)</u>

*United States v. Black, et al.*,
No. 05 CR 727 (N.D. Ill. June 24, 2011) ............................................................. 14

*United States v. Burke*,
425 F.3d 400 (7th Cir. 2005) ............................................................................... 55

*United States v. Clarke*,
No. 11 C 7404, 2012 WL 588708 (N.D.Ill. Feb 16, 2012) .................................. 27

*United States v. Daccarett*,
6 F.3d 37 (2d Cir. 1993) ...................................................................................... 37

*United States v. Doe*,
867 F.2d 986 (7th Cir. 1989) ............................................................................... 27

*United States v. Emor*,
794 F. Supp. 2d 143 (D.D.C. 2011) ..................................................................... 60

*United States v. Freeman*,
No. 07 CR 843, 2009 U.S. Dist. LEXIS 76973 (N.D. Ill. Aug. 26, 2009) ............ 55

*United States v. Gonzalez-Lopez*,
548 U.S. 140 (2006) ...................................................................................*passim*

*United States v. Gottlieb*,
738 F.Supp. 1174 (N.D. Ill. 1990) ....................................................................... 27

*United States v. Halsey*,
257 F. Supp. 1002 (S.D.N.Y. 1966) ..................................................................... 38

*United States v. Harris*,
464 F.3d 733 (7th Cir. 2006) ............................................................................... 38

*United States v. Harrison*,
400 F. Supp. 2d 780 (E.D. Pa. 2005) ................................................................... 46

*United States v. Hatfield*,
No. 06–CR–0550 (JS), 2010 WL 1685826 (E.D.N.Y. Apr. 21, 2010) ................. 31

*United States v. Hoffman*,
519 F.3d 672 (7th Cir. 2008) ............................................................................... 38

*United States v. Jacobs*,
986 F.2d 1231 (8th Cir. 1993) ............................................................................. 39

*United States v. Jenkins*,
16 Fed. App'x. 64 (2d Cir. 2001) .................................................................. 38, 47

**TABLE OF AUTHORITIES**
(continued)

<u>Page(s)</u>

*United States v. Lowe*,
    516 F.3d 580 (7th Cir. 2008) .......................................................................................... 47

*United States v. Masters*,
    924 F.2d 1362 (7th Cir. 1991) ...................................................................................... 46

*United States v. Mechanik*,
    475 U.S. 66 (1986) ...................................................................................................... 58

*United States v. Michelle's Lounge*,
    39 F.3d 684 (7th Cir. 1994) .......................................................................................... 60

*United States v. Monsanto*,
    491 U.S. 600 (1989) ............................................................................................. *passim*

*United States v. Morgan*,
    346 U.S. 502 (1954) ............................................................................................. 26, 28

*United States v. Morris*,
    80 F.3d 1151 (7th Cir. 1996) ...................................................................................... 43

*United States v. Moya-Gomez*,
    860 F.2d 706 (7th Cir. 1988) ................................................................................. 59, 60

*United States v. One 1997 E35 Ford Van*,
    50 F. Supp. 2d 789 (N.D. Ill. 1999) ........................................................................... 37

*United States v. Payne*,
    741 F.2d 887 (7th Cir. 1984) ...................................................................................... 27

*United States v. Pregent*,
    190 F.3d 279 (4th Cir. 1999) ...................................................................................... 27

*United States v. Reivich*,
    793 F.2d 957 (8th Cir. 1986) ...................................................................................... 39

*United States v. Rosen*,
    487 F. Supp. 2d 723 (E.D. Va. 2007) ........................................................................ 33

*United States v. Sellers*,
    645 F.3d 830 (7th Cir. 2011) ...................................................................................... 30

*United States v. Smith*,
    618 F.3d 657 (7th Cir. 2010) ...................................................................................... 30

*United States v. Stein*,
    435 F. Supp. 2d 330 (S.D.N.Y. 2006) .................................................................. *passim*

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Stein,*
  541 F.3d 130 (2d Cir. 2008) ...............................................................32, 33, 35, 36

*United States v. Turner,*
  551 F.3d 657 (7th Cir. 2008) ...........................................................................43

*United States v. Turner,*
  594 F.3d 946 (7th Cir. 2010) ...........................................................................30

*United States v. U. S. Currency Deposited in Account No. 1115000763247 for Active
  Trade Co.,*
  176 F.3d 941 (7th Cir. 1999) ......................................................................38, 45

*Walters v. Nat'l Assn. of Radiation Survivors,*
  473 U.S. 305 (1985) ..........................................................................................28

*Wilson v. Russo,*
  212 F.3d 781 (3d Cir. 2000) .......................................................................39, 47

STATUTES

18 U.S.C. § 981(a)(2)(B) .....................................................................................45, 46

18 U.S.C. § 1963 .......................................................................................................8

21 U.S.C. § 853 .......................................................................................................50

28 U.S.C. § 2255 ....................................................................................5, 26, 27, 62

42 U.S.C. § 1983 .....................................................................................................38

All Writs Act, 28 U.S.C. § 1651(a) .........................................................................26

RULES

Fed. R. Civ. P. 60(b)(5) ...........................................................................................27

N.D. Ill. L.R. 83.51.2(f)(2) ......................................................................................53

N.D. Ill. L. R. 83.53.3(a)(4) .....................................................................................57

N.D. Ill. L.R. 83.53.8 ...............................................................................................53

OTHER AUTHORITIES

ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION AND DEFENSE FUNCTION 3-
  3.2(c) (1993) ......................................................................................................61

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Immigration and Refugee Protection Act, S.C. 2001 (Can.)........................................................27

U.S. CONST. amend. IV. .................................................................................................*passim*

U.S. CONST. amend. V..................................................................................................*passim*

U.S. CONST. amend. VI. ................................................................................................*passim*

## INTRODUCTION

By now anyone with glancing familiarity with Conrad Black's case will not have failed to recognize that the Government's case was not what it was represented to be. After the Government voluntarily abandoned a certain count post-indictment, there remained 13 counts charging Mr. Black that went to the jury. Of these, Mr. Black was acquitted of nine. After Supreme Court review, reversal, and remand, two counts were retrieved that were, to say the least, thin.

Less known is the fact that from the very outset of the criminal proceedings against Mr. Black, the prosecution resorted to outright deception of the court to prevent Mr. Black from meeting them squarely in the battle they waged against him (that resulted in the destruction of two billion dollars of Hollinger International ("International" ) shareholder value). This motion explains fully the mechanics of the prosecution's tactics. It reveals that the case against Mr. Black was built upon deceptions that rose to the level of constitutional violations in depriving Mr. Black of his Sixth Amendment right to counsel of his choice, as well as his Fourth and Fifth Amendment protections. This is the corrupt means by which the criminal case against Mr. Black was won. Given this prosecutorial misconduct, it is just and appropriate that the last remaining counts of conviction also be vacated.

## PRELIMINARY STATEMENT

*"The United States Attorney…may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."*

*Berger v. United States, 295 U.S. 78, 88 (1935).*

The right to counsel of one's choice is protected by the Constitution. It is a right so fundamental, so critical to the criminal justice system, that once that right is improperly denied,

no additional prejudice is required to make the violation complete. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 146 (2006). That rule of law protects our society. A criminal indictment places into jeopardy a defendant's most precious gift – his freedom – in a way that is unique. The law guarantees the defendant the right to counsel to stand and speak for the defendant in defense of his liberty. Given that reality, the Constitution requires that the defendant not be improperly prevented from being represented by counsel of his choice.

Conrad Black was intentionally deprived of his right to the counsel of his choice by knowing or reckless false statements made to courts by the Government as to its right to seize property, and as to the factual underpinning of forfeiture counts of an indictment. Facing allegations that he engaged in improper conduct at his company, Mr. Black sought the assistance of counsel of his choice, Brendan V. Sullivan and Gregory B. Craig of Williams & Connolly LLP ("Williams & Connolly"). To afford his chosen counsel, Mr. Black entered into a contract to sell his Manhattan apartment (the "Manhattan Apartment"), which would have provided him with nearly $9 million to retain counsel of his choice to conduct his defense. However, moments after the closing of the sale, knowing full well that Mr. Black intended to use the assets to pay for counsel, the Government seized the entire amount, pursuant to two improperly obtained warrants.

The deceptive affidavit in support of the pre-indictment seizures of Mr. Black's assets spun a tale of fraud surrounding the purchase and transfer of the Manhattan Apartment by and between Mr. Black and his company as a basis for seizing the apartment proceeds. The affidavit was ostensibly authored by Special Agent Mark A. Coleman, presumably under the supervision of Assistant United States Attorney ("AUSA") Eric Sussman and AUSA Robert Kent from the Northern District of Illinois, who crafted it using selective words from documents that ignored or

misrepresented critical factual and economic terms of those same documents.[1]  For example, the Special Agent asserted that Mr. Black represented the fair market value of the Manhattan Apartment as being $3 million when in fact, as the Government was well aware, Mr. Black made no such representation.  The Special Agent further asserted that Mr. Black paid $3 million for the company's beneficial interest in the Manhattan Apartment when, in fact, he spent upwards of $7.6 million, which was well in excess of what the Special Agent represented would have been the then fair market value of the Manhattan Apartment.  Instead of annexing the agreements to the affidavit, thereby affording the Court the opportunity to independently review the terms of the agreements underlying the transactions, the Government submitted an affidavit fraught with omissions that purportedly provided evidence of a crime that in fact did not occur.

The Government's misconduct did not end with the civil forfeiture. Following the seizures, Williams & Connolly sought the return of the money seized or a portion thereof, explaining the lack of probable cause for the seizures as well as Mr. Black's need for the seized funds to pay counsel to represent him in connection with criminal charges.  When Williams & Connolly made an administrative claim revealing the deceptions in the affidavit in support of forfeiture, the Government was not moved.  When Williams & Connolly sued civilly to recover the property, the Government, knowing the claims to be valid, acted to bar judicial review – and succeeded.

The Government responded by filing an indictment with the same false forfeiture allegations despite having in its possession competent evidence that demonstrated the charges were without merit.  ████████████████████████████████████████

---

[1]  The names of AUSAs Robert Kent and Eric Sussman appear on the face of the warrant application. *See* Exhibit 1 to the Accompanying Affidavit of Marc D. Powers ("Powers Affidavit").

████████████████████████████████████████████████

████████████████████████████████████████████████

Rather than acknowleging that Mr. Black had committed no crime regarding his Manhattan Apartment, and abandoning the forfeiture, the Government concealed key exculpatory facts, which directly related to whether Mr. Black had an intent to defraud, and proceeded with the indictment. This maneuver effectively precluded any further judicial inquiry at the time, thereby denying Mr. Black the opportunity to contest the property seizures. That conduct ultimately kept Williams & Connolly, his counsel of choice, from representing Mr. Black at trial and violated his right to due process of law.

The counts of the indictment related to the Manhattan Apartment were without foundation, and were filed to keep Mr. Black's money away from his counsel of choice.[2] Indeed, after a multi-year investigation and a four month-long trial, the Government failed to garner even enough evidence to satisfy the "preponderance of the evidence" standard and the Trial Court found the Government was not entitled to forfeiture of the specific property.[3]

The violation of Mr. Black's constitutional rights cannot be excused because the governmental action in this case does not fall within one of the limited circumstances in which the Government might properly act to deprive a defendant of his chosen counsel. When, as in this case, the Special Agent and the AUSAs know that the funds were paid pursuant to contract, and not unlawfully, there was no probable cause to believe the assets were forfeitable. Hence, the seizure was unlawful at the time, the indictment was improper at the time, and the seizure of

---

[2] This matter is being raised by Mr. Black now as the accuracy of the affidavit through which Mr. Black's assets were seized in civil forfeiture proceedings pretrial was not part of the trial record and therefore not a ground for a direct appeal.

[3] *See* Powers Exhibit 2 at 30-31.

the property on these facts for the purpose of depriving Mr. Black of counsel of his choice was likewise improper. That successful deprivation requires that Mr. Black's conviction and sentence be vacated, regardless of the quality of representation he ultimately received.

The constitutional violations occurring in this case go directly to the heart of Mr. Black's conviction: Mr. Black was intentionally denied counsel of his choice by Government action, not once, but twice: First, the Government presented a misleading and inaccurate affidavit to the Magistrate in support of civil forfeiture of Mr. Black's property. Second, █████████████████████ █████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ they filed an indictment reciting unfounded charges and containing unmeritorious criminal forfeiture counts. Submission of the false affidavit, pretrial seizure of funds known to be earmarked for payment of counsel and the filing of the baseless counts of the indictment effectively, intentionally and wrongfully denied Mr. Black the constitutional right to counsel of his choice. Preventing review of the warrant by knowingly including baseless counts of an indictment demonstrated that the AUSAs were striking "foul blows," not just hard ones. This course of conduct infected Mr. Black's trial and necessitates that the conviction for the remaining counts which were not dismissed by the Govenrment pre-verdict, or for which Mr. Black was acquitted by the jury, or which were vacated by the United States Supreme Court, be vacated. The existence of Mr. Black's wrongful conviction is also currently affecting an ongoing civil case by the United States Securities and Exchange Commission against him in which the Government is asserting collateral estoppel against Mr. Black based upon it.

Based upon violations of his constitutional rights, Mr. Black requests that this Court order the indictment against him be dismissed in its entirety pursuant to 28 U.S.C. § 2255, or, in

the alternative, for this Court to issue a writ of error *coram nobis* vacating the conviction and sentence previously imposed based upon violations of Mr. Black's constitutional rights.  If the Government has an explanation for the conduct, and seeks a hearing to produce that evidence, Mr. Black has no objection.

## STATEMENT OF FACTS

### I.    MR. BLACK RETAINS WILLIAMS & CONNOLLY IN CONNECTION WITH THE PRE-INDICTMENT CRIMINAL INVESTIGATION

Prior to 2004, Mr. Black was a newspaper owner and columnist who was the Chairman and controlling shareholder of Hollinger.  Allegations emerged that Mr. Black had engaged in improper conduct at Hollinger, and a special committee of the Board of Directors commissioned an internal investigation.  Months prior to the seizures at issue in this case, Mr. Black anticipated possible criminal charges and sought the assistance of counsel.[4]  At the time, he had selected – and could reasonably afford – pre-indictment representation by Williams & Connolly.

In November 2004 and March 2005, Williams & Connolly had conversations with AUSA Robert Kent from the Northern District of Illinois regarding the criminal investigation.  On June 7, 2005, Messrs. Brendan Sullivan and Gregory Craig of Williams & Connolly met with AUSA Kent and AUSA Eric Sussman, who ultimately led the trial team.  Having identified themselves as counsel for Mr. Black, they were asked two questions – whether Mr. Black would accept the jurisdiction of the Court and whether the law firm would accept subpoenas on his behalf.[5]  By this time, it was clear to Mr. Black and to Williams & Connolly that he would need their services at trial.

---

[4] *See* the accompanying Affidavit of Brendan V. Sullivan, Esq. ("Sullivan Affidavit") at ¶¶ 5, 9; the accompanying Affidavit of Gregory B. Craig, Esq. ("Craig Affidavit") at ¶¶ 6, 11.

[5] *See* Craig Affidavit at ¶ 8.

Mr. Black told Mr. Sullivan and Mr. Craig that he wished to retain Williams & Connolly to represent him in the event he was indicted.[6] Mr. Black, having discussed the cost of defending himself with his chosen lawyers, decided to sell a cooperative apartment he owned at 635 Park Avenue, Second Floor, in New York City (as previously defined, the "Manhattan Apartment") specifically to obtain these funds.[7]

## II. MR. BLACK CONTRACTS TO SELL HIS MANHATTAN APARTMENT TO PAY WILLIAMS & CONNOLLY'S PROJECTED TRIAL RETAINER

On June 8, 2005, the day after Williams & Connolly's meeting with the United States Attorney's Office ("USAO"), Mr. Black entered into a contract to sell the Manhattan Apartment (the "Apartment Sale").[8] The transaction called for a down payment deposit of $1,020,000 (the "Contract Deposit"), with the balance due at the closing (collectively the "Apartment Proceeds").[9] Ultimately, Mr. Black was to receive a second check for $7,908,867 at the closing.[10]

Attorneys at Sullivan & Cromwell LLP ("Sullivan & Cromwell") represented Mr. Black in the Apartment Sale. The Contract Deposit was held by Sullivan & Cromwell in its attorney trust account pending the closing of the transaction.[11] Attorneys at Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") represented the buyers. Though it was originally scheduled

---

[6] *See* Sullivan Affidavit at ¶ 9; Craig Affidavit at ¶ 11.

[7] *See* Craig Affidavit at ¶ 11.

[8] *See* Powers Affidavit Exhibit 3 at ¶ 1.16.

[9] *Id.*

[10] *See* Powers Affidavit Exhibit 4.

[11] *See* Powers Affidavit Exhibit 3 at ¶ 1.2.1; Powers Affidavit Exhibit 4 at ¶¶ 2, 4, and 5.

for August 1, 2005, the closing of the Apartment Sale did not take place that day.[12] A Skadden

attorney appears to have coordinated with certain of the prosecutors assigned to Mr. Black's case

and provided information about the time and place of the closing, the amount of the check Mr.

Black was to receive at closing, and the purported bank account number of the attorney trust

account at Sullivan and Cromwell in which the contract deposit for the Manhattan Apartment

was held.[13] The Skadden attorney's effort with the Government resulted in the buyers obtaining

a letter, dated September 6, 2005, from AUSA Sussman on behalf of the USAO stating that the

Government believed the buyers were "bona fide purchasers for value" of the Manhattan

Apartment within the meaning of 18 U.S.C. § 1963.[14] This letter set forth the Government's

position that the buyers would not be subject to an order of forfeiture with respect to the

Manhattan Apartment subsequent to their purchase. Based upon this letter, Mr. Black was lulled

into a false sense of security that the Government would not challenge the transaction.[15] After

several delays, which seem to have been caused by Government coordination with the Skadden

attorney representing the buyers, the sale arrangements were finalized and the Apartment Sale

was set to close on October 7, 2005.[16]

---

[12] *Id.* at ¶ 1.15.

[13] Powers Affidavit Exhibit 5 at 36:22-37:6; Powers Affidavit Exhibit 1 at ¶¶2, 19, and 20.

[14] See Powers Affidavit Exhibit 6. Presumably, AUSA Sussman was aware of his own actions and those of the agents with whom he was working at the time.

[15] *See* Powers Affidavit Exhibit 7 at 39:8-40:2.

[16] *See* Powers Affidavit Exhibit 4 at ¶¶ 9, 12.

### III. THE GOVERNMENT USES A MISLEADING AFFIDAVIT TO OBTAIN A DEFECTIVE WARRANT AND SEIZE THE APARTMENT PROCEEDS WHILE CONTEMPLATING FURTHER SEIZURES

On October 6, 2005, a month after the letter from AUSA Sussman, Special Agent Mark A. Coleman swore an affidavit (the "Coleman Affidavit" or the "Affidavit"),[17] apparently reviewed by AUSAs Kent and Sussman, and submitted it to the Magistrate for the next day. Special Agent Coleman claimed that the Apartment Proceeds were the proceeds of a fraud against Hollinger, and were properly subject to forfeiture. The Affidavit relied upon two documents that were not attached to the Affidavit and made false and misleading statements that were contradicted by those very documents. Based on the Affidavit submitted, seizure warrants were issued for the Apartment Proceeds.[18]

On the day of the Apartment Sale closing, October 7, 2005, the buyers gave Mr. Black's attorney from Sullivan & Cromwell a check payable to Mr. Black in the amount of $7,908,867. Immediately after she departed the closing conference room, federal agents approached Mr. Black's attorney and seized the check for the balance of the Apartment Sale.[19] Federal agents also served a second seizure warrant and seized the Contract Deposit, which had been held in Sullivan & Cromwell's attorney trust account at Citibank, N.A.[20]

---

[17] *See* Powers Affidavit Exhibit 1.

[18] *See* Powers Affidavit Exhibits 8, 9.

[19] *See* Powers Affidavit Exhibit 4 at ¶ 19.

[20] *Id.* at ¶ 21.

IV. **WILLIAMS & CONNOLLY ALERTS THE GOVERNMENT TO THE FACTUAL INACCURACIES UNDERLYING THE SEIZURE AND TO THE FACT THAT THE SEIZURE IMPLICATES MR. BLACK'S RIGHT TO COUNSEL OF CHOICE**

In response to the seizure of the nearly $9 million, on October 19, 2005, Mr. Craig sent a letter contesting the seizures to the FBI and seeking the return of the seized funds.[21]  He argued that the Government had orchestrated the seizures in order to deprive Mr. Black of the funds he needed and intended to use to retain counsel for expected criminal proceedings.

Mr. Craig wrote:

> We are aware that the United States Attorney for the Northern District of Illinois has impaneled a grand jury which has returned indictments against three defendants who are related to Mr. Black. One of those defendants, F. David Radler, has agreed to plead guilty to one count of wire fraud.  Mr. Radler has also agreed to cooperate with the Government in exchange for a sharply reduced prison sentence.  A criminal indictment of Mr. Black seems imminent.

> The Government knows full well that this seizure imposes substantial hardship on Mr. Black.  His decision to sell this property was prompted by his need for funds to pay counsel in connection with any such criminal charges.  The timing of the Government's action – and the gross overreaching involved – can only raise questions as to the Government's true motivation.  It is akin to confiscating David's slingshot on the eve of his encounter with Goliath.  Putting aside the fact that the seizure itself is totally unjustifiable, such tactics are unconscionable.[22]

In a notice dated October 21, 2005, the FBI acknowledged receipt of the administrative claim and informed Mr. Black that the matter had been referred to the USAO for the Northern District of Illinois and to the AUSAs who had reviewed the seizure warrants.[23]  Williams &

---

[21] *See* Powers Affidavit Exhibit 10.

[22] *Id.* at 5.

[23] *See* Powers Affidavit Exhibit 11.

Connolly did not receive further communications from the FBI relating to the seizure following its submission of the administrative claim.[24]

On October 28, 2005, Mr. Black filed a Motion for the Return of Seized Property in the United States District Court for the Northern District of Illinois.[25] In this motion, Mr. Black argued that Special Agent Coleman's Affidavit failed to establish the necessary probable cause to support the seizure. This document challenged the timing of the seizure and the Government's motivation in seizing the Apartment Proceeds.[26] On November 4, 2005, Mr. Black filed a supplemental memorandum with the District Court.[27] In this memorandum, Mr. Black argued that Special Agent Coleman omitted material information from the Affidavit and that, had this information been presented, it would have been clear that the circumstances demonstrated an utter lack of probable cause to believe that Mr. Black was involved in any fraud relating to the Manhattan Apartment.[28] Mr. Black's submissions to the court explicitly described the seizures as improper, gave the Government notice of these violations and made clear that the seizure would adversely affect Mr. Black's right to counsel of his choice. The docket reflects that the Government's Response to Mr. Black's Motion for the Return of Seized Property was due on November 21, 2005.[29] Rather than respond to the accurate allegations against them, the AUSAs took action to keep their misconduct from being scrutinized by the Court.

---

[24] *See* Sullivan Affidavit at ¶ 11; Craig Affidavit at ¶ 14.

[25] *See* Powers Affidavit Exhibit 12.

[26] *Id.*

[27] *See* Powers Affidavit Exhibit 13.

[28] *Id.*

[29] *See* Powers Affidavit Exhibit 14.

## V.    THE    GOVERNMENT    KNOWINGLY    FILES    AN    UNSUPPORTED INDICTMENT AGAINST MR. BLACK IN ORDER TO AVOID ANSWERING THE CHALLENGE TO THE CONSTITUTIONALITY OF THE SEIZURE

On November 17, 2005, four days before its scheduled response date on Mr. Black's motion, the Government filed a criminal indictment including forfeiture counts related to the Manhattan Apartment.[30]  By doing so, the Government avoided the need to respond to Mr. Black's challenge to the propriety of the seizure.  In the Government's November 21, 2005 Response to Petitioner's Motion for the Return of Seized Property, the Government argued in accordance with well established law, *inter alia*, that Mr. Black's challenge to the seizure of the Apartment Proceeds was mooted by the Manhattan Apartment-related forfeiture counts in the indictment.[31] The problem, and it is of constitutional magnitude, is that the prosecutors knew before filing the indictment that the counts relating to the Manhattan Apartment and the forfeiture counts were baseless and deceptive in that their own evidence disproved their claims.

## VI.    THE GOVERNMENT'S SEIZURE OF THE APARTMENT PROCEEDS TERMINATE MR. BLACK'S ABILITY TO RETAIN COUNSEL OF CHOICE IN THE CRIMINAL ACTION

Because the Government seized the nearly $9 million in Apartment Proceeds five weeks prior to Mr. Black's indictment, Mr. Black did not have the liquid assets necessary to pay the retainer Williams & Connolly required for his post-indictment representation.[32]  As the Government attested, neither could he challenge the probable cause for the Affidavit supporting

---

[30] See Powers Affidavit Exhibit 15.

[31] *See* Powers Affidavit Exhibit 16 at 2, 8-9.  Accordingly, the docket reflects that Mr. Black's Motion for Return of Seized Property was withdrawn on December 19, 2005.  *See* Powers Affidavit Exhibit 17.

[32] *See* Sullivan Affidavit at ¶ 14; Craig Affidavit at ¶¶ 11, 12, and 19.

the seizure outside the context of his criminal trial.  Mr. Black ultimately hired less expensive lawyers from small firms to represent him in connection with the criminal charges.

## VII.  MR. BLACK IS ACQUITTED OF ALL BUT FOUR COUNTS AND THE GOVERNMENT FAILS TO MEET EVEN THE CIVIL STANDARD NECESSARY TO OBTAIN A FORFEITURE ORDER

A Second Superseding Indictment was filed on December 15, 2005.  Mr. Black entered a plea of Not Guilty to all counts of the Second Superseding Indictment on December 16, 2005.  A Third Superseding indictment was filed on August 17, 2006.  After a series of superceding indictments, a Superseding Information was filed on January 10, 2007 containing 17 counts, fourteen of which were against Mr.  Black.  The Government ultimately dismissed one of the counts originally charged against Mr. Black before the case went to the jury, and on July 13, 2007, the jury acquitted Mr. Black of nine of the thirteen charges including all allegations relating to the Manhattan Apartment.[33]

As the evidence came in over the course of trial, the Government steadily reduced the amount it sought in forfeiture from Mr. Black and his co-defendants for what it had originally charged as a nearly $84 million scheme.  On August 13, 2007, after the jury's verdict was entered and after Mr. Black's acquittal on all charges relating to the Manhattan Apartment entered, the Government sought the forfeiture of nearly $17 million from the defendants from what it then alleged to be a $32 million scheme, including the Apartment Proceeds.  In a December 10, 2007 Order, the Court refused to order the forfeiture of the Apartment Proceeds, although it held the defendants jointly and severally liable for $6.1 million relating to other events.  The Court found that the Government failed to provide adequate evidence to support its

---

[33] The jury trial was held before the Honorable Amy J. St. Eve from March 2007 to June 2007, with the jury beginning its deliberations on June 27, 2007.  Mr. Black did not testify at trial.  The Jury returned its verdict on July 13, 2007.  *See* Powers Affidavit Exhibit 18.

claims by even a preponderance of the credible evidence that the funds relating to Mr. Black's

Manhattan Apartment – i.e. the funds at issue in this petition which were earmarked for Mr.

Black's criminal defense – were "'traceable to" or 'derived from'" a fraudulent scheme.[34]  Mr.

Black's funds were eventually returned.  But it was too late.[35]

Between August 27, 2007 and June 24, 2011, Mr. Black's case went through a series of

appeals which resulted in his conviction and sentence being affirmed in part and reversed in

part.[36]

## VIII. MANIFEST ERRORS AND OMISSIONS IN THE COLEMAN AFFIDAVIT ALLOW THE GOVERNMENT TO SEIZE MR. BLACK'S PROPERTY IMPROPERLY

### A. Factual Background Regarding Manhattan Apartment

Eleven years prior to his criminal indictment, Mr. Black and a Hollinger subsidiary

(hereinafter referred to as "Hollinger") entered an agreement whereby Hollinger would purchase

the Manhattan Apartment for Mr. Black's use when he was in New York (the "1994

---

[34] The "scheme" was simple:  Conrad Black sold his interest in an apartment.  It just was not fraudulent.  *See* Powers Affidavit Exhibit 2 at 30-31.

[35] *See* Powers Affidavit Exhibit 7 at 8:23-9:16, 87:1-3.

[36] On August 27, 2007, Mr. Black filed a Motion for a New Trial and a Motion for Judgment of Acquittal, which were denied on November 5, 2007.  The Seventh Circuit Court of Appeals denied Mr. Black's appeal on June 25, 2008.  Mr. Black filed a Petition for a Writ of Certiorari to the United States Supreme Court on January 9, 2009, which was granted on May 18, 2009.  The Supreme Court vacated the judgment of the Seventh Circuit and remanded for further proceedings.  *See Black v. United States*, 130 S.Ct. 2963 (2010).  On October 29, 2010, the Seventh Circuit affirmed in part and reversed in part Mr. Black's conviction and sentence.  *See United States v. Black*, 625 F.3d 386 (7th Cir. 2010).  The Seventh Circuit remanded the case to this Court.  *Id*.  Mr. Black again sought Supreme Court review of the Seventh Circuit's judgment filing a petition for certiorari review on February 17, 2011.  The Supreme Court denied the petition without reaching the merits on May 31, 2011.  *See Black v. United States,* 131 S.Ct. 2932 (2011).  On June 24, 2011, this Court entered Mr. Black's final judgment of conviction and sentence in accordance with the Seventh Circuit's opinion. *United States v. Black, et al.*, No. 05 CR 727 (N.D. Ill. June 24, 2011) [Dkt. 1217].  See Powers Affidavit Exhibit 19.

Agreement").[37]   Because Hollinger could not hold title to this cooperative apartment, the 1994 Agreement specified that Hollinger would provide the funds to Mr. Black to purchase the Manhattan Apartment and thereafter own the beneficial interest; Mr. Black would retain title.[38]

The 1994 Agreement contains a critical provision of which the Government was aware but concealed from the Court. Hollinger agreed to provide Mr. Black with "funds to pay the entire purchase price of Apartment, all closing costs and all capital improvements, decorating and furnishings needed . . . to put the Apartment into appropriate habitable condition for the uses contemplated by [Mr. Black] and [Hollinger]."[39]   However, Hollinger did not pay for all of the improvements, as it had contracted to do, and Mr. Black instead invested more than $4.6 million of his own funds into improving[40] and furnishing the Manhattan Apartment.[41]   The 1994 Agreement also granted Mr. Black an exclusive option to purchase the beneficial interest in the Manhattan Apartment and any improvements paid for by Hollinger for what they agreed was "the then aggregate fair market value thereof"[42]; if Mr. Black and Hollinger could not agree to the fair market value, the value would be "determined by arbitration before three arbitrators

---

[37] *See* Powers Affidavit Exhibit 20.

[38] *Id.* at ¶ 2.

[39] *Id.* at ¶ 1.

[40] Improvements included major structural renovations necessary to modernize the Manhattan Apartment.

[41] *See* Powers Affidavit Exhibit 21 at 11887:22-11888:1 (testimony of forensic accountant Lee Williams, stating that the total renovation, furnishing, and decoration expenditures amounted to $4,625,780.41).  As shown below, Hollinger acknowledged these expenditures in the December 2000 agreement by which Mr. Black later purchased the beneficial interest in the Manhattan Apartment.

[42] *See* Powers Affidavit Exhibit 20 at ¶ 5(a).

knowledgeable in the New York cooperative apartment market."[43] In 1998, Mr. Black separately purchased an apartment on the ground floor of the same building (the "Ground Floor Apartment") for $499,000, which Hollinger paid to refurbish and used "to house Company executives and other business guests while visiting New York."[44] Guest logs from the Ground Floor Apartment supported its business use.

In 2000, Mr. Black decided to exercise his option to purchase the beneficial interest in the Manhattan Apartment and entered into an agreement with Hollinger (the "2000 Transfer Agreement"). Mr. Black and Hollinger agreed that, in consideration of "substantial capital improvements to the [Manhattan Apartment], all at his own expense,"[45] the fair market value of Hollinger's beneficial interest in the Manhattan Apartment was $3 million.[46] Hollinger received in excess of $7.6 million ($3 million plus the over $4.6 million of capital improvements) for its beneficial interest in the Manhattan Apartment. The parties agreed that Mr. Black would pay Hollinger $2,150,000 and assign to the company Mr. Black's beneficial interest in the Ground Floor Apartment, the agreed fair market value of which was $850,000, and forgive Hollinger's debt for the over $4.6 million in capital improvements.[47] This transaction (the "2000 Transaction") was performed openly between Mr. Black and Hollinger, and was disclosed to the Hollinger shareholders.

---

[43] *Id.* at ¶ 5(b).

[44] *See* Powers Affidavit Exhibit 22 at HLRMM135528.

[45] *Id.* at HLRMM135527.

[46] *Id.* at HLRMM135528.

[47] *Id.*

**B.    The Coleman Affidavit Included Materially False Statements and Omitted Essential Information**

The Coleman Affidavit asserted that the 2000 Transaction was fraudulent, and thus, the proceeds were subject to forfeiture. This affidavit included materially false statements, omitted essential material information, and included factual inaccuracies. The Magistrate could not have been aware of these material omissions because the Special Agent and the reviewing AUSAs concealed the full text of the documents on which they purported to rely.

The essence of Special Agent Coleman's application for the seizure warrant is the Government's claim that the Apartment Proceeds were the result of an alleged "fraudulent representation."[48] The purported false representation was that during the 2000 Transaction Mr. Black supposedly stated that the fair market value of the Manhattan Apartment was $3 million. That is false. Mr. Black made no such representation as to Manhattan Apartment's value. Nor is there any factual basis for the assertion. In fact, as the Government learned prior to indictment, Mr. Black was informed by others at Hollinger about the $3 million fair market price (net of the improvements and furnishing). Mr. Black was indirectly provided a memorandum from Paul B. Healy, a Vice President at Hollinger, stating that real estate professionals supported the position that $3 million was a fair market price for the Manhattan Apartment (again, net of Mr. Black's investment),[49] and Mr. Black agreed with that.

At a minimum, allegations of fraud require that the perpetrator have knowledge of a falsehood. The Coleman Affidavit fails to recite facts sufficient to establish that Mr. Black had knowledge of any falsehood with respect to the 2000 Transaction or even that there existed any falsehoods with respect to that transaction.

---

[48] *See* Powers Affidavit Exhibit 1 at ¶ 15.

[49] See Powers Affidavit Exhibit 23.

1.    <u>The Coleman Affidavit Inaccurately Represented the Nature of the Interests in the 1994 Agreement and 2000 Transaction and the $3 Million Agreed Value of the Manhattan Apartment</u>

The central premise of the seizure warrant is that the purchase price Mr. Black paid to Hollinger for Hollinger's beneficial interest in the Manhattan Apartment was $3 million. That premise is patently false. In fact, the value assigned to the Manhattan Apartment, and provided to Hollinger, was almost double that amount. Among the allegations in his Affidavit, Special Agent Coleman swore that "Black fraudulently caused [Hollinger] to sell [the Manhattan Apartment] to him for the same price that [Hollinger's] subsidiary had paid for it in December 1994 – $3 million" when the deal called for the "then aggregate fair market value."[50] The Special Agent further alleged that "[i]n connection with this purchase, there is probable cause to believe that Black schemed to defraud [Hollinger] of property, namely [the Manhattan Apartment], and its right to receive honest services[51] from its controlling shareholder, officers and directors" and that Mr. Black perpetrated this alleged fraud by "falsely representing to [Hollinger] that the fair market value of [the Manhattan Apartment] in December 2000 was $3 million, when, in fact, [the Manhattan Apartment] had substantially appreciated during the six years that it was owned by [Hollinger's] subsidiary."[52] These allegations are are fraught with misrepresentations and omissions.

The Affidavit refers to but does not attach the 1994 Agreement between Mr. Black and Hollinger. That agreement was a mere six pages in length. The Affidavit swore that the 1994

---

[50] *See* Powers Affidavit Exhibit 1 at ¶¶ 11, 13.

[51] On Supreme Court review of Mr. Black's case, the Court determined that the honest services mail fraud charges set forth in the Indictment failed to allege criminal conduct. *See Black v. United States*, 130 S.Ct. 2963 (2010).

[52] *See* Powers Affidavit Exhibit 1 at ¶ 13.

Agreement "granted Black an option to purchase [Hollinger's] beneficial interest in [the Manhattan Apartment] at a later date, including any capital improvements or furnishings of the apartment paid for by the company at a price equal to the then aggregate fair market value thereof, payable in cash at the closing of the purchase."[53] The 1994 Agreement also contained a provision in which Hollinger specifically assumed the obligation to pay for any renovations to the Manhattan Apartment. That provision was critical to understanding the sum that Mr. Black eventually paid Hollinger for the Manhattan Apartment pursuant to the 2000 Agreement. Yet it was intentionally omitted from the Affidavit.

Further, the Coleman Affidavit fails to mention that Mr. Black's option to purchase was exclusive and terminable only upon the date he sent a notice to Hollinger informing them that he "desire[d] to terminate" the 1994 Agreement.[54] Once Hollinger granted Mr. Black this exclusive option, there was no more "market" for the Manhattan Apartment. As such, costs for similar apartments in the neighborhood on which the Affidavit based its purported valuation of the Manhattan Apartment were substantially irrelevant. The only relevant sales price was the one to which Holinger and Mr. Black could agree upon. This critical aspect of the valuation of the Manhattan Apartment is omitted from the Coleman Affidavit.

The Affidavit was similarly deceptive about the 2000 Transaction. As with the 1994 Agreement, the Affidavit referred to the Transfer Agreement for the 2000 Transaction but did not attach that agreement to the Affidavit. The Transfer Agreement was only six pages long. The 2000 Transfer Agreement specifically stated "Executive made substantial capital improvements

---

[53] See Powers Affidavit Exhibit 1 at ¶11.

[54] *See* Powers Affidavit Exhibit 20 at ¶¶ 4, 5, and 7.

to the Second Floor Apartment, all at his own expense."[55] The Coleman Affidavit nowhere mentioned this critical fact. Instead, the Affidavit presented the 2000 Transaction as an exchange of the full ownership interest in one apartment for a sum of money and the full ownership interest in another apartment. This was a false presentation. The 2000 Transfer Agreement clearly states that the transaction entailed the exchange of the beneficial interest of the Ground Floor Apartment, the sum of $2,150,000, *and the forgiveness of a longstanding debt owed by Hollinger to Mr. Black*, for the beneficial interest in the Manhattan Apartment.

According to the Coleman Affidavit, in the 2000 Transfer Agreement, Mr. Black "represented that 'the fair market value' of [Hollinger's] 'beneficial interest' in [the Manhattan Apartment] was $3,000,000."[56] Mr. Black made no such representation. As stated in the document itself, Hollinger and Mr. Black agreed to this price as part of a complex transaction. Given the other consideration, it is clear from the face of the 2000 Transfer Agreement that the parties arrived at a market value of the Manhattan Apartment well in excess of $3 million.

The Coleman Affidavit ignores the essence of the 2000 Transaction in order to present a single number, $3 million, as though it were the full purchase price of all interests in the Manhattan Apartment. In fact there were two monetary sums mentioned – one, the $3 million that was specified, and the other, the "substantial capital improvements" for which Mr. Black had paid even though Hollinger was obligated to pay for them, the amount of which was not specified.[57] The Affidavit omitted any reference to the latter and thereby grossly misrepresented the agreement of the parties.

---

[55] See Powers Affidavit Exhibit 22 at HLRMM135527.

[56] *Id.* at ¶ 14.

[57] *See* Powers Affidavit Exhibit 22 at HLRMM135527.

In fact, Mr. Black paid upwards of $7.6 million for the Mahattan Apartment – well over the $5.4 million the Coleman Affidavit indicates would be the fair market value of the unit if it were a comparable condominium.[58] The written text of the 2000 Transfer Agreement, which the Special Agent did not provide to the Magistrate, recognizes Mr. Black's substantial payment of Hollinger's obligations under the 1994 Agreement.[59] As was established at trial, during the time Hollinger beneficially owned the Manhattan Apartment, Mr. Black personally expended more than $4.6 million for renovations and improvements.[60] Consequently, Mr. Black's payment of the more than $4.6 million was a payment of Hollinger's obligation.[61] At the time Mr. Black exercised his option to purchase the Manhattan Apartment in December 2000, he effectively paid Hollinger $4.6 million dollars in pre-paid funds (the forgiveness of the money Mr. Black was owed by Hollinger for incurring the expense of refurbishing of the Manhattan Apartment), $2.15 million in cash, and $850,000 in real property (the value of the beneficial interest of the Ground

---

[58] The "fair market value" of the Manhattan Apartment, as set forth in the Coleman Affidavit, was erroneously inflated. The Coleman Affidavit offered evidence of the average sales prices of condominiums in "the relevant neighborhood" rather than cooperative prices, despite the clear language in the 1994 Agreement and the 2000 Transfer Agreement that the Manhattan Apartment was a cooperative not a condominium. *See* Powers Affidavit Exhibit 1 at ¶ 15. Cooperative and condominium prices are not equivalent with condominium prices typically being higher.

[59] *See* Powers Affidavit Exhibit 22 at HLRMM135527.

[60] *See* Powers Affidavit Exhibit 21 at 11887:22-11888:1 (testimony of forensic accountant Lee Williams, stating that the total renovation, furnishing, and decoration expenditures amounted to $4,625,780.41).

[61] Even by the time of the seizure, it could be established by a single invoice in Mr. Black's possession that Mr. Black personally invested more than $2.27 million for renovations to the Manhattan Apartment: Mr. Black paid Fairfax & Sammons Architects and Clark Construction Corporation a total of $2,275,000.00 for improvements made to the Manhattan Apartment, as reflected in the final change order dated March 5, 1997. *See* Powers Affidavit Exhibit 24. That the Agent supervised by two AUSAs quoted the 2000 Transfer Agreement referencing improvements but failed to inform the Magistrate of that provision let alone the purported value is beyond reckless; it is deceptive.

Floor Apartment).   Mr. Black's investment was known to Special Agent Coleman and was unquestionably material.   Nevertheless, neither the agent nor the prosecutors disclosed the information to the Magistrate or to this Court.

> 2.    Special Agent Coleman Excluded a Memorandum Purporting to Impartially Establish the Fair Market Value of the Manhattan Apartment as $3 Million

Special Agent Coleman's Affidavit also excluded a memorandum dated December 21, 2000,[62] written by Mr. Healy ("Healy Memorandum") ████████████████████████ ████████████.   The 2000 Transfer Agreement reflects that Hollinger and Mr. Black "*agreed* . . . [that] the fair market value of the Company's beneficial interest in the Second Floor Apartment. . . is $3,000,000,"[63] consistent with the intent of the 1994 Agreement.   The Healy Memorandum memorializes these fair market values and the parties' agreement to them.[64]   In the memorandum, Mr. Healy recites that he engaged in a number of "in-depth discussions" with a number of "New York City real estate specialists" and that "it has been agreed that the fair market value of [the Manhattan Apartment] is US $ 3,000,000.   The fair market value of the Ground Floor apartment at the same address is US$850,000 [sic]."[65]   Although the Healy Memorandum existed in Hollinger's files after December 2000 and was available to him, Special Agent Coleman did not include it or reference it in his Affidavit.   Given that search warrants are normally obtained under time pressure, certain latitude normally may be permitted.   But here the three documents necessary to establish the relevant facts were the 1994 Agreement, the 2000

---

[62] *See* Powers Affidavit Exhibit 23.

[63] *See* Powers Affidavit Exhibit 22 at ¶ 1 (emphasis added).

[64] *See* Powers Affidavit Exhibit 23.

[65] *Id.*

Tranfer Agreement, and the Healy Memorandum. The 1994 Agreement and the 2000 Transfer Agreement were both specifically referred to in the Coleman Affidavit although not attached to it. The Healy Memorandum was available to the Government ███████████████ ███████████████████████████████████. Special Agent Coleman's decision not to refer to the memorandum was either reckless in not seeking the truth or intentionally deceptive.

Special Agent Coleman swore that Mr. Black made intentional representations about the Manhattan Apartment's fair market value. If Special Agent Coleman obtained and reviewed the Healy Memorandum, which was availabe to him and which presented this figure, then he knew or should have known that the Healy Memorandum was neither created at Mr. Black's direction nor even addressed to him.[66] Mr. Black subsequently received a copy of the memorandum from Mr. Healy, and relying on its contents, the parties came to an agreement regarding the Manhattan Apartment's fair market value.[67] ███████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████, Mr. Black was never told, never acknowledged, and never knew that the fair market value of the Manhattan Apartment recorded in the Healy Memorandum was incorrect. ███████████████████████████ ██████████████████████████████████████[68] The

---

[66] *See* Powers Affidavit Exhibit 25 at May 21, 2007 PM, lines 2610-2615, 2714-2751; May 23, 2007 PM, lines 403-404, 755-757, 900.

[67] *Id.* at May 21, 2007 PM, lines 2714-2751.

[68] *See* Powers Affidavit Exhibit 26 at USA_002254.

Coleman Affidavit failed to reveal that Mr. Black was not party to the Healy Memorandum or its inaccuracy. On this, as on other points, Magistrate Judge Mason was misled by the Special Agent and the prosecutors.[69]

3.   Special Agent Coleman Misidentified the Sullivan & Cromwell Client Trust Account

One of the two types of property identified for seizure by the Coleman Affidavit is the Contract Deposit in the amount of $1,020,000, which was allegedly held in "an account named Attorney Escrow Account for Lord Conrad Black at Citibank, N.A. in New York, New York."[70] In fact, the account in which the check was deposited bears an entirely different account number and is not named "Attorney Escrow Account for Lord Conrad Black." Rather, this account is the trust account for Sullivan & Cromwell, and is titled "Sullivan & Cromwell Attorney Trust Account," accurately reflecting that the account was not dedicated solely to Mr. Black's funds, but instead housed funds belonging to many of Sullivan & Cromwell's clients. An independent Magistrate might have hesitated to seize funds from a pooled attorney trust account for such a major law firm had it been informed that was the case.

## IX.   THE GOVERNMENT INTENTIONALLY FILED BASELESS FORFEITURE COUNTS AFTER BEING PRESENTED WITH DETAILS OF THE 2000 TRANSACTION BY WILLIAMS & CONNOLLY ████████████████

As described above, in response to Williams & Connolly's attempts to challenge the seizures, four days before the Government's response to that challenge was due, the Government filed an indictment on November 17, 2005 before the grand jury, which had the effect of foreclosing any further challenges. Counts 10 and 11 of the indictment alleged wire fraud related

---

[69] ████████████████████████████████████████

[70] *See* Powers Affidavit Exhibit 1 at ¶¶ 2, 20.

to the 2000 Transaction, and Forfeiture Allegations 1, 2 and 3 requested forfeiture of the Apartment Proceeds.

By the time the Government added these wire fraud and forfeiture counts to the indictment, Williams & Connolly had alerted the Government to the details of the 2000 Transaction and the implications of the seizure on Mr. Black's Sixth Amendment rights. ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████

## X.  THE GOVERNMENT'S ACTIONS DEPRIVED MR. BLACK OF HIS CONSTITUTIONAL RIGHT TO BE REPRESENTED BY COUNSEL OF CHOICE

Although lawyers represented Mr. Black at trial,  they were not the lawyers he had selected prior to the seizure of the Apartment Proceeds.  As the Government's actions resulted in a denial of Mr. Black's right to be represented by counsel of choice, Mr. Black now comes before this Court to request that his conviction be vacated and set aside for manifest constitutional violations on the part of the Special Agent and the AUSAs acting for, in the name of, and with the power of the United States Government.

---

[71] *See* Powers Affidavit Exhibits 26-29.

[72] *Id.*

## ARGUMENT

### I. STANDARD FOR RELIEF

"A prisoner in custody under sentence of a court established by Act of Congress" who has exhausted all other remedies may seek relief from a federal conviction by filing a motion under 28 U.S.C. § 2255 (a "2255 Petition"). Although relief under Section 2255 is an extraordinary remedy, it is available to those, such as Mr. Black, who "can demonstrate that there are flaws in the conviction or sentence which are jurisdictional in nature, constitutional in magnitude, or result in a complete miscarriage of justice." *Boyer v. United States*, 55 F.3d 296, 298 (7th Cir. 1995). More specifically, relief from a conviction or sentence is available if the petitioner demonstrates "that the district court sentenced him in violation of the Constitution or laws of the United States or that the sentence was in excess of the maximum authorized by law or is otherwise subject to collateral attack." *Hays v. United States*, 397 F.3d 564, 566-67 (7th Cir. 2005) (citations and internal quotations omitted). A petitioner is entitled to a hearing on his 2255 petition if he "alleges facts that, if proven, would entitle" him to relief. *Stoia v. United States*, 22 F.3d 766, 768 (7th Cir. 1994). "If the court determines that . . . errors [cognizable under § 2255] infected the judgment or sentence, the petitioner's conviction will be vacated or set aside, and the petitioner will be discharged, resentenced, or granted a new trial." *Pointer v. United States*, No. 03 C 1433, 2004 WL 524720, at *1 (N.D. Ill. Mar. 11, 2004).

Likewise, a writ of error *coram nobis* under the All Writs Act, 28 U.S.C. § 1651(a), is relief "of the same general character" as a 2255 Petition, *see United States v. Morgan,* 346 U.S. 502, 510, n. 4 (1954), and "affords the same general relief." *Chaidez v. United States*, 655 F.3d 684, 687 (7th Cir. 2011). The Petitioner must establish "that the claim could not have been raised on direct appeal, that the conviction produces lingering civil disabilities, and that the error is the type of defect that would have justified habeas corpus relief pursuant to 28 U.S.C. § 2255."

*United States v. Gottlieb*, 738 F.Supp. 1174, 1177 (N.D. Ill. 1990) (quoting *United States v. Doe*,

867 F.2d 986, 988 (7th Cir. 1989)). A writ of error *coram nobis* may be brought as a collateral

challenge to a criminal conviction by those who are no longer in federal "custody," for whom

relief under 28 U.S.C. § 2255 is unavailable.[73] *Id.* at 1177-78 (citation omitted). As with a 2255

Petition, this writ is warranted "only under circumstances compelling such action to achieve

---

[73] Pursuant to the terms of his Judgment of Conviction, entered on July 5, 2011, Mr. Black was sentenced to a two-year term of supervised release following his term of imprisonment. *See* Powers Affidavit Exhibit 30, at 3. Accordingly, Mr. Black satisfies the "custody" requirement of 28 U.S.C. § 2255. *See United States v. Clarke*, No. 11 C 7404, 2012 WL 588708, at *2 (N.D.Ill. Feb 16, 2012) ("Supervised release has been recognized as a form of custody for purposes of Section 2255's "in custody" requirement.") (citing *Kusay v. United States*, 62 F.3d 192, 193 (7th Cir. 1995)); *United States v. Pregent*, 190 F.3d 279, 283 (4th Cir. 1999) (same).

In addition, Mr. Black faces serious immigration consequences stemming directly from his felony conviction, including his inability to re-enter the country to visit his daughter, who resides in the United States, and the impediment his conviction presents to his citizenship status. Mr. Black is a citizen of the United Kingdom but has been provided a temporary residency permit in Canada. To the extent he seeks permanent residence or citizenship in Canada, his conviction may act as an impediment. *See* Immigration and Refugee Protection Act, S.C. 2001, c. 27 (Can.)(discussing criminal admissibility of foreign nationals convicted outside of Canada).

Further, Mr. Black continues to be a defendant in an SEC enforcement action seeking injunctive relief and restitution. *Securities and Exchange Commission v. Black, et al.*, Civil Action No. 04C7377 (N.D. Ill. Nov. 15, 2004)**.** In that case, the United States successfully used Mr. Black's conviction to obtain partial summary judgment based on collateral estoppel on certain of the charges. The case continues and is in discovery. Vacation of Mr. Black's conviction should result in vacatur of the partial summary judgment. *See* Fed. R. Civ. P. 60(b)(5). Moreover, Mr. Black's criminal conviction has also resulted in continuing hardships in his native Canada, including being used as a basis for attempts to remove his membership in the Order of Canada, an honor that is bestowed on Canadian citizens for achievements of outstanding merit or distinguished service, and his appointment to the Queen's Privy Council, a governmental advisory board for state and constitutional affairs. Mr. Black has been successful thus far in combatting these efforts, but his conviction continues to have serious negative consequences.

Petitioner respectfully submits that the foregoing satisfies the requirements of 28 U.S.C. § 2255. *United States v. Payne*, 741 F.2d 887, 890 (7th Cir. 1984) ("It is well settled that even if a convict is not actually incarcerated, Section 2255's 'in custody' requirement is satisfied so long as he is subject to significant restraints on his freedom at the time he files for relief."); *Carafas v. Lavallee*, 391 U.S. 234, 237-39 (1968). If it is this Court's determination that Mr. Black no longer satisfies the "custody" requirement such that he may seek relief under Section 2255, this motion seeks the alternative relief of a writ of error *coram nobis,* as the hardships detailed above amount to legal disability of such significance to require *coram nobis* relief. *Gottlieb*, 738 F.Supp. at 1177.

justice." *United States v. Morgan*, 346 U.S. 502, 511 (1954). Such circumstances are present here.

## II. THE GOVERNMENT'S SEIZURE OF THE APARTMENT PROCEEDS AND SUBSEQUENT INDICTMENT DEPRIVED MR. BLACK OF HIS COUNSEL OF CHOICE IN VIOLATION OF THE SIXTH AMENDMENT

The Government violated Mr. Black's Sixth Amendment right to the counsel of his choice through deliberate violations of Mr. Black's rights under the Fourth and Fifth Amendments. Mr. Black's Sixth Amendment claim arises from the Government's improper seizure of the Apartment Proceeds. As discussed above, as of June 2005 – well before the seizure – the Government was aware that Mr. Black had retained Messrs. Sullivan and Craig to defend any criminal action against him. When it then learned that Mr. Black was selling the Manhattan Apartment, the Government utilized a false Affidavit to consummate a seizure and a defective indictment to bar judicial scrutiny of the false Affidavit.

### A.    Scope of the Sixth Amendment Right to Counsel

The Sixth Amendment has been interpreted to assure not only a right to secure representation and a standard of competence, but also to define a clear entitlement for criminal defendants to the counsel of their choice. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006). The Supreme Court has examined the scope of this right, concluding that while a criminal defendant does not have a boundless entitlement to any hypothetical attorney he so desires, a defendant has a right to make use of his own funds to retain the counsel of his choice. *See Caplin & Drysdale, Chartered, v. United States*, 491 U.S. 617, 626 (1989) (quoting *Walters v. Nat'l Assn. of Radiation Survivors*, 473 U.S. 305, 370 (1985)).

As explained by the Supreme Court in *United States v. Gonzalez-Lopez*:

> Deprivation of the right is "complete" when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of representation he received. To argue otherwise is to confuse the right

> to counsel of choice – which is the right to a particular lawyer regardless of comparative ineffectiveness – with the right to effective counsel – which imposes a baseline requirement of competence on whatever lawyer is chosen or appointed.

*Gonzalez-Lopez*, 548 U.S. at 148. In *Gonzalez-Lopez*, the trial court repeatedly denied an application to appear *pro hac vice* by the defendant's counsel of choice to appear in place of alternately-retained counsel after his chosen attorney had violated a local rule during an initial appearance. *Id.* at 142-3. Deprived of his counsel of choice, Gonzalez-Lopez was found guilty for conspiracy to distribute marijuana. On appeal, the Eighth Circuit held that the District Court's denials of the applications of his counsel of choice were erroneous and violated the defendant's Sixth Amendment right to paid counsel of choice. *Id.* at 143-44. The Supreme Court rejected the Government's claims that the competent representation of appointed counsel and the otherwise fair trial that followed had remedied any violation that may have occurred. The Court found that the Sixth Amendment "commands, not that a trial be fair, but that a particular guarantee of fairness be provided – to wit, that the accused be defended by the counsel he believes to be best." *Id.* at 146. The Court held that, regardless of the fairness of the process that followed, where a defendant's choice of counsel was improperly impeded, the Sixth Amendment "right was violated because the deprivation of counsel was erroneous" and "[n]o additional showing of prejudice is required to make the violation 'complete.'" *Id.*

The *Gonzalez-Lopez* Court also rejected arguments that a violation of a defendant's right to counsel of choice was subject to "harmless error" review, making clear that a Sixth Amendment deprivation of this type is a "structural error," to evaluate the relative harmlessness of which would require "a speculative" – and therefore fruitless – "inquiry into what might have occurred in an alternate universe." *Id.* at 150. Put simply, because such a Sixth Amendment violation pervades the entire trial, "[a] choice-of-counsel violation occurs *whenever* the defendant's choice is wrongfully denied." *Id.* (emphasis in original) (reversing defendant's

conviction upon finding that defendant's Sixth Amendment right to paid counsel of his choice was violated).

The Seventh Circuit has adopted the Supreme Court's holding in *Gonzalez-Lopez* that the deprivation of the defendant's Sixth Amendment right to retain chosen counsel is a structural error that justifies reversal without inquiry into prejudice. *See United States v. Sellers*, 645 F.3d 830 (7th Cir. 2011) (vacating defendant's conviction upon a finding that his Sixth Amendment right to counsel of choice was violated where denial of his motion for a continuance to substitute new counsel was arbitrary); *United States v. Smith*, 618 F.3d 657 (7th Cir. 2010) (vacating defendant's guilty plea upon finding that her Sixth Amendment right to counsel of choice was violated where the trial court set the trial date when defendant's counsel was unavailable and thereafter refused to entertain a continuance); *United States v. Turner*, 594 F.3d 946 (7th Cir. 2010) (vacating defendant's conviction upon finding that defendant's Sixth Amendment right to counsel of choice was violated where the trial court erroneously disqualified defendant's attorney based on a conflict of interest).

**B.      Absent Probable Cause, Forfeiture Of Assets A Defendant Intends To Use To Retain Counsel Is Not Proper.**

While a prosecutor "may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935). The Government may move to protect its own interests in property by seizing and seeking to forfeit property, and if that forfeiture has the effect of depriving a defendant of counsel of his choice, there is no harm of constitutional magnitude, *so long as the forfeiture was proper*. The Supreme Court explicitly established this principle in *United States v. Monsanto*, in which the Court rejected a Sixth Amendment challenge brought by a defendant who intended to pay his attorneys with the forfeitable proceeds of drug crimes. 491 U.S. 600, 616 (1989). In *Monsanto*, a four-day probable cause hearing was held in which the

Government "overwhelmingly established a likelihood" that the assets would be forfeited at the end of trial. *Id*. at 605. While not deciding whether such a hearing is required before the imposition of a pretrial restraining order, the Court held that the finding of probable cause to believe the assets will ultimately be forfeitable permitted the restraint on Monsanto's assets. *Id*. at 615. Monsanto was convicted of the charges against him and a special verdict was returned finding the assets in question to be forfeitable beyond a reasonable doubt. *Id*. at 605, n. 4.

However, *Monsanto* does not stand for the proposition that forfeiture of funds needed to pay legal fees can *never* violate the Sixth Amendment. As explained by the *Monsanto* Court:

> [I]f the Government may, post-trial, forbid the use of forfeited assets to pay an attorney, then surely no constitutional violation occurs when, *after probable cause is adequately established*, the Government obtains an order barring a defendant from frustrating that end by dissipating his assets prior to trial.

*Id*. at 616 (emphasis added); *see United States v. Hatfield*, No. 06–CR–0550 (JS), 2010 WL 1685826, *4 (E.D.N.Y. Apr. 21, 2010) (granting *Monsanto* hearing in which the Government must establish probable cause that the money resulted from the defendant's illegal activities and excluding as forfeitable property obtained absent the fraud). The *Monsanto* Court specifically conditioned the permissibility of pretrial restraint of funds on an adequate finding of probable cause, the key factor that allows the relation back doctrine to attach and the funds in question to be considered the Government's property. *Monsanto,* 491 U.S. at 615. Absent such probable cause – and there was not probable cause in Mr. Black's case – the funds in question are not the Government's to claim. While a proper forfeiture to the Government of seized legal fees may be permissible under *Monsanto*, the Sixth Amendment is still violated where the seized funds never belonged to the Government in the first place.

C. **The Government May Not Use Improper Means to Deprive a Defendant of Legitimately-Available Funds Intended for the Payment of Counsel of Choice**

*United States v. Stein* further elaborates the scope of the Sixth Amendment right to counsel of choice when the Government interferes with a defendant's financial ability to retain his chosen counsel. *See United States v. Stein*, 435 F. Supp. 2d 330 (S.D.N.Y. 2006) [hereinafter *Stein I*]; *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008) [hereinafter *Stein (2d Cir.)*]. In the *Stein* case, the Second Circuit upheld the dismissal of an indictment against several defendants whose employer's promise to pay their legal fees had been withdrawn at the instigation of the Government. *Stein (2d Cir.)*, 541 F.3d at 136. The employer, KPMG, LLP ("KPMG"), had a "common practice" of reimbursing the legal costs of its officers and had volunteered to do so in the course of the expected indictments relating to an alleged tax scheme for several such officers. *Id.* at 137. However, KPMG also faced indictment and representatives of the USAO repeatedly intimated during conversations with KPMG's attorneys that it would be viewed as "misconduct" on the part of the company if KPMG continued to provide legal fees to the accused officers. *Id.* at 148. In the course of KPMG's successful campaign to avoid indictment, the firm first conditioned, later capped, and then ultimately withdrew any payment of legal fees from those of its officers facing charges. *Id.* at 136.

Several KPMG officers, although still able to afford representation, were compelled to seek alternate counsel than originally intended. *Id.* at 151 n.10. These defendants moved to dismiss their indictment, alleging that the Government's interference with their expected source of funds had forced them to seek alternate counsel, in violation of their Sixth Amendment right to counsel of choice and the fundamental fairness guaranteed by the Fifth Amendment's Due Process clause. *Stein I*, 435 F. Supp. 2d at 336. The District Court held that guarantees under both the Fifth and Sixth Amendments had been violated by the Government's actions, as

"[w]hile a defendant does not have a constitutional right to the most expensive lawyer or to unlimited defense funds, government interference with those resources that a defendant does have, or legally may obtain fundamentally alters the structure of the adversary process." *Id.* at 372.[74]

Although violations of the Sixth Amendment are generally not found in conduct predating the formal institution of proceedings, a Sixth Amendment violation occurs where particular pre-indictment conduct creates consequences for choice of counsel after the indictment. *See Stein (2d Cir.)*, 541 F.3d at 153; *United States v. Rosen*, 487 F. Supp. 2d 723, 734 (E.D. Va. 2007). The *Stein* Court held that "[w]hen the government acts prior to indictment so as to impair the suspect's relationship with counsel post-indictment, the pre-indictment actions ripen into cognizable Sixth Amendment deprivations upon indictment." *Stein (2d Cir.)*, 541 F.3d at 153. Hence, the Government's pre-indictment actions forcing KPMG to adopt a constricted fee policy, which included termination of fee advancement upon indictment of an employee, was not immune from Sixth Amendment scrutiny. *Id.* at 154. The Eastern District of Virginia similarly recognized in *United States v. Rosen*, that if "the government [took the alleged improper action] for the purpose of undermining defendants' relationship with counsel once the indictment is issued, the government violated defendants' right to expend their own resources toward counsel once the right attached." *Rosen*, 487 F. Supp. 2d at 734.

The Second Circuit upheld the District Court's determination that the United States had deprived officers at KPMG of their Sixth Amendment right to counsel of their choice and their ability to mount a defense. *Stein (2d Cir.)*, 541 F.3d at 136. Holding that "the Sixth Amendment protects against unjustified governmental interference with the right to defend oneself using

---

[74] In Mr. Black's case it was to effect just that forbidden alteration of the structure of the adversary process that the AUSAs acted as they did.

whatever assets one has or might reasonably and lawfully obtain," the Second Circuit affirmed dismissal of the indictment as to 13 defendants. *Id*. at 156. The Government's actions resulted in the improper withholding of funds to the defendants, thereby restricting the scope of the defense available to them and impairing their representation by their chosen counsel, and thus dismissal of the indictment was called for.

### D. The Government Violated Mr. Black's Sixth Amendment Rights by Depriving him of his Property Without a Basis in Order to Foreclose his Ability to Hire Counsel of Choice

The Government's interference with funds Mr. Black needed to retain Williams & Connolly falls squarely within the scope of the categorically improper conduct described by *Gonzalez-Lopez*, *Stein* and their progeny, and Mr. Black's conviction must be vacated. Mr. Black owned a Manhattan Apartment and sold it to obtain funds with which to retain his counsel of choice.[75] The Government improperly seized the proceeds of the sale, in violation of Mr. Black's Fourth and Fifth Amendment rights, and kept them until the trial was concluded. Despite being told (a) that the Affidavit was defective[76] and thus, the initial seizure was improper, and (b) that the seizure would prevent Mr. Black from retaining counsel of his choice,[77] the Government nevertheless filed an indictment containing forfeiture counts falsely alleging that Mr. Black had intentionally engaged in fraud in valuing the Manhattan Apartment, effectively placing those funds out of reach of Mr. Black for the duration of the trial.

---

[75] *See* Craig Affidavit at ¶ 11.

[76] ████████████████████████████████████████████████████
████████████████████████████████████████ *See* Powers Affidavit Exhibits 26-29. The Government also knew or should have known that Mr. Black had paid millions of dollars for the substantial renovations to the Manhattan Apartment, renovations that Hollinger had contracted to pay. *See* Powers Affidavit Exhibits 10, 12, 13, 21 at 11887:22-11888:1, 22, and 24.

[77] *See* Powers Affidavit Exhibits 10, 12, and 13.

As was the case with the counsel of choice in *Gonzalez-Lopez*, Mr. Black's chosen attorneys had already commenced work on his case at the time of the improper Government action that prevented them from continuing his representation. Williams & Connolly attorneys had already met with the USAO on several occasions, and the Government was well aware of their representation of Mr. Black at any future criminal proceedings.[78] As explained in the supporting affidavits of Messrs. Sullivan and Craig, the only reason for their withdrawal was Mr. Black's sudden loss of liquidity to pay the required retainer, a loss that was directly attributable to the Government's actions.[79]

Here, the Government's conduct was even more targeted than in the *Stein* case, where the Government interfered with a source of legal fees which could *ultimately* be considered to belong to the defendants. In this instance, the Government swiftly and effectively interceded to remove the *specific funds* from Mr. Black himself on the eve of their payment to the counsel of his choice. As in *Stein*, Mr. Black was left, due to Government action, with resources "inadequate to defend [his] case as [he] would have absent the government's actions." *Stein (2d Cir.)*, 541 F.3d at 151 n.10 (citation omitted). As the resources in question affected his ability to retain his choice of counsel, under *Gonzalez-Lopez*, the Sixth Amendment violation was complete as soon as the Government's improper action forced Mr. Black to seek alternate legal counsel. *Gonzalez-Lopez*, 548 U.S. at 148. The Government's further misconduct in filing baseless forfeiture counts in the indictment against Mr. Black compounded the injury by depriving this Court of the jurisdiction to determine whether probable cause existed for the

---

[78] *See* Craig Affidavit at ¶¶ 7-9; Sullivan Affidavit at ¶¶ 6-7.

[79] *See* Sullivan Affidavit at ¶ 14; Craig Affidavit at ¶ 19. Other Government efforts to seize any assets Mr. Black attempted to liquidate are evidenced in the Government's investigation notes. *See* Powers Affidavit Exhibits 31-36.

seizure in the first place.  These compounded constitutional errors directly resulted in a further violation of Mr. Black's constitutional rights:  as a direct consequence of the Fourth and Fifth Amendment violations, the Government denied Mr. Black access to his constitutionally-guaranteed counsel of choice.

Under *Stein*, the remedy for a Sixth Amendment violation of this type is Government or judicial action that returns a defendant to the same condition, the "*status quo ante*," that existed prior to the violation.  *Stein (2d Cir.)*, 541 F.3d at 146.  The *Stein* Court held that the only way to return the defendants to the *status quo ante* of the violation in that case would be to restore pretrial access to "unconditional, unlimited advancement of legal fees." *Id.*  As it was impossible to turn back the clock and provide the defendants with pretrial access to the funds at issue, there was no remedy for the Sixth Amendment violation and dismissal of the indictment was required. *Id.*  Here, as in *Stein*, the remedy to return the *status quo ante* of the Sixth Amendment violation – namely to return the defendant to the economic status he would have had absent the violation in time to retain his counsel of choice for trial – is likewise impossible.  The trial has already taken place without Williams & Connolly.  The *status quo ante* – representation at trial by chosen counsel – is no longer possible in light of Mr. Black's previous trial, conviction, and his resulting years of incarceration.  Consequently, the reversal of the two remaining counts of Mr. Black's conviction and dismissal of his indictment is warranted.

## III.    THE SEIZURE OF THE APARTMENT PROCEEDS USING A DEFECTIVE AFFIDAVIT VIOLATES THE FOURTH AMENDMENT

As this Court found, the Government failed to amass sufficient evidence – even by the end of the lengthy criminal trial – to prove by even a *civil standard* that the transaction through which Petitioner had purchased his Manhattan Apartment from Hollinger was anything but

legitimate.[80]   Yet, the Coleman Affidavit that the Government presented to Magistrate Judge Mason purports to outline a fraud with sufficient particularity to give rise to an inference of probable cause to believe a crime took place.   The reason for this discrepancy is simple:   the Government submitted an Affidavit that presented an inaccurately conclusory portrayal of a legitimate transaction in order to seize Mr. Black's funds.   The Government's motive was to foreclose his access to the counsel of Mr. Black's choice, in violation of his Fourth Amendment rights.

The Fourth Amendment provides that "no Warrants shall issue" absent "probable cause." U.S. CONST. amend. IV.   The Government must first show that there is probable cause to believe that the specific property to be seized is ultimately subject to forfeiture as proceeds of a crime, *see Marine Midland Bank, N.A., v. United States*, 11 F.3d 1119, 1126 (2d Cir. 1993), and this showing must be made through a truthful and accurate presentation to the court.   *Franks v. Delaware*, 438 U.S. 154, 164-65 (1978).

A.      The Standard for Determining the Adequacy of a Warrant

To support a finding of probable cause in the context of a pretrial seizure, the Government must establish a "nexus" between the property sought to be seized and the illegal conduct alleged.   *United States v. Daccarett*, 6 F.3d 37, 46 (2d Cir. 1993) (finding such a nexus where the totality of extensive bank records, seized documents, and investigator testimony plainly tied bank accounts to drug trafficking); *United States v. One 1997 E35 Ford Van*, 50 F. Supp. 2d 789, 796 (N.D. Ill. 1999) (finding a nexus where extensive records of money laundering transactions and the receipt of funds demonstrated a seized van's connection to the crime alleged).   While the use of false testimony alone will not necessarily defeat probable

---

[80] *See* Powers Affidavit Exhibit 2 at 30-31.

cause, the Government's remaining evidence must be sufficient to supply the requisite basis for seizure. *United States v. U. S. Currency Deposited in Account No. 1115000763247 for Active Trade Co.*, 176 F.3d 941, 942 (7th Cir. 1999) (upholding seizure where false statements related to type of fraud alone, and where additional true statements and evidence supplied a basis for seizure). Here, probable cause was completely lacking because the transaction was not criminal, and the Government had before it documentary and testimonial evidence of the lack of criminality.

The sufficiency of affidavits in support of warrants may be challenged on the basis that they contain false statements. *See Franks v. Delaware*, 438 U.S. at 154 (granting a hearing on admissibility of evidence obtained using a search warrant containing false statements alleged to have been made in bad faith). As observed in *Franks*, "the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing." *Id.* at 164-65 (*quoting United States v. Halsey*, 257 F. Supp. 1002, 1005 (S.D.N.Y. 1966) (emphasis in original)). Any challenge to a warrant must include "allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Id.* at 171.

The Seventh Circuit has further clarified the *Franks* rule and held that a "defendant may also challenge an affidavit by demonstrating that the affiant intentionally or recklessly omitted material information." *United States v. Hoffman*, 519 F.3d 672, 675 (7th Cir. 2008) (*citing United States v. Harris*, 464 F.3d 733, 738 (7th Cir. 2006)); *see also Molina v. Cooper*, 325 F.3d 963, 968 (7th Cir. 2003) (in the context of a § 1983 action). Recklessness may be inferred where the omitted information was "clearly critical" to the probable cause determination. *United States v. Jenkins*, 16 Fed. App'x. 64, 67 (2d Cir. 2001) (citation omitted); *see also Rivera v. United*

*States*, 928 F.2d 592, 604 (2d Cir. 1991); *DeLoach v. Bevers*, 922 F.2d 618, 622 (10th Cir. 1990); *Hale v. Fish*, 899 F.2d 390, 400 (5th Cir. 1990); *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986). An omission is made with reckless disregard if "an officer withholds a fact in his ken [when] 'any reasonable person would have known that this was the kind of thing the judge would wish to know." *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000) (*quoting United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)).

As discussed below, the Affidavit in support of the seizure warrant contained numerous misstatements, inaccuracies and omissions that, in light of the evidence available to the Government at the time, were either recklessly or knowingly and intentionally made. Accordingly, the seizure warrant was not founded on probable cause and the Apartment Proceeds were seized in violation of Mr. Black's Fourth Amendment rights.

**B.**     **The Coleman Affidavit and the Seizure Warrants are Invalid as a Result of Special Agent Coleman's Reckless and/or Intentional Material Misstatements and Omissions of Fact**

1.     The Coleman Affidavit's False Allegations

The Coleman Affidavit purported to provide facts to support seizure of the Apartment Proceeds as proceeds of a crime. Specifically, the Coleman Affidavit alleged that Mr. Black committed a fraud in 2000 when he purchased the Manhattan Apartment for $3 million knowing that the fair market value of the unit was higher than that. According to the Coleman Affidavit, Mr. Black engaged in fraud by falsely representing to Hollinger that the fair market value of the Manhattan Apartment was $3 million.[81] Special Agent Coleman certified that his recitation of events was based on his "review of documents," "information acquired from [unspecified]

---

[81] *See* Powers Affidavit Exhibit 1 at ¶ 13.

witnesses," and "other [unspecified] information obtained during the course" of the criminal investigation.[82]

The Coleman Affidavit also repeatedly quoted selected portions of the two agreements through which Mr. Black had gained possession over and later full ownership of the Manhattan Apartment. The Coleman Affidavit describes how the 1994 Agreement "granted Black an option to purchase [Hollinger's] beneficial interest in [the Manhattan Apartment] at a later date, including any capital 'improvements or furnishings of the apartment paid for by the company, 'at a price equal to the then aggregate fair market value thereof, payable in cash at the closing of the purchase.'"[83] The Coleman Affidavit then describes how, in the 2000 Transfer Agreement, Mr. Black exercised his option to purchase the Manhattan Apartment, but incorrectly states that "[r]ather than paying 'the then aggregate fair market value,' as required by the option agreement, Black fraudulently caused [Hollinger] to sell [the Manhattan Apartment] to him for the same price that [Hollinger's] subsidiary had paid for it in December 1994 – $3 million."[84] The Special Agent continued on to allege that "[i]n connection with this purchase, there is probable cause to believe that Black schemed to defraud [Hollinger] of property, namely [the Manhattan Apartment], and its right to receive honest services from its controlling shareholder, officers and directors."[85]

Specifically, the Coleman Affidavit claimed that Mr. Black perpetrated this alleged fraud by "falsely representing to [Hollinger] that the fair market value of [the Manhattan Apartment] in

---

[82] *Id.* at ¶ 1. The first page of the Coleman Affidavit lists the AUSAs associated with the application.

[83] *See* Powers Affidavit Exhibit 1 at ¶ 11.

[84] *Id.* at ¶ 13.

[85] *Id.*

December 2000 was $3 million, when, in fact, [the Manhattan Apartment] had substantially appreciated during the six years that it was owned by [Hollinger's] subsidiary."[86]  Special Agent Coleman further swore that, in the 2000 Transfer Agreement, Mr. Black "represented that 'the fair market value' of [Hollinger's] 'beneficial interest' in [the Manhattan Apartment] was $3,000,000."[87]  To substantiate his false assertion, he swore that, based on "New York City's Department of Finance, Repeat Sales Price Index" for condominiums, the "'fair market value' of [the Manhattan Apartment] in December [was] $5.4 million, not the $3 million that Black paid."[88]  Those statements were not true when made.

As described below, Special Agent Coleman ignored evidence that was contained in the very documents he cited, other evidence that was available in the form of testimony, and omitted other evidence, all of which would have shown that Mr. Black's purchase of the Manhattan Apartment was not fraudulent.

2.     The Coleman Affidavit Contained Several Mistakes of Fact that Were Apparent From the Face of the 1994 and 2000 Transfer Agreements

The Coleman Affidavit contained several basic factual omissions that were at best recklessly made, as his statements are contradicted by the very agreements upon which Coleman purportedly relied.  First and foremost, as was evident by a reading of the 1994 Agreement and 2000 Transfer Agreement – two documents totaling twelve pages that inexplicably were not annexed to the Affidavit – Hollinger was obligated to pay for all renovations and capital improvements to the Manhattan Apartment.  Between 1994 and 2000, Mr. Black  spent more than $4.6 million in renovations and capital improvements.  Hollinger did not meet their

---

[86] *Id.*

[87] *Id.* at ¶ 14.

[88] *Id.* at ¶ 15.

obligation to pay for those improvements. Instead, contrary to the 1994 Agreement, the renovations were made at Mr. Black's own cost; he was not reimbursed or otherwise compensated for those capital improvements. The 2000 Transfer Agreement explicitly referenced these improvements, as well as the fact that they were implemented entirely at Mr. Black's expense.[89] The Coleman Affidavit omitted all discussion of those capital improvements and of the reference to them in the 1994 Agreement and 2000 Transfer Agreement. In doing so the Affidavit asserted that the transfer of Mr. Black's interest in the Ground Floor Apartment (valued at $850,000) and the payment of $2.15 million in cash were the only consideration in Mr. Black's purchase of the Manhattan Apartment. This representation was innaccurate. For Mr. Black to pay $4.6 million to improve the Manhattan Apartment, and then pay the market value as improved would have him pay twice, which is absurd.

Second, the Affidavit failed to consider that Mr. Black had, under the 1994 Agreement, an *exclusive* option to purchase the beneficial interest in the shares of the Manhattan Apartment. Accordingly, the "market" to consider was not the market of condominium purchasers as stated in the Coleman Affidavit, but a cooperative market *limited exclusively to Mr. Black*. The 1994 Agreement between Mr. Black and Hollinger specifically provided that Mr. Black would be permitted to purchase Hollinger's beneficial interest in the Manhattan Apartment **at a price to be agreed upon between Mr. Black and Hollinger.** The 1994 Agreement went on to provide for provision of an arbitration panel in the event that Mr. Black and Hollinger could not come to

---

[89] *See* Powers Affidavit Exhibit 22 at ¶ 1.

terms on a purchase price. Thus the Affidavit's reliance on market[90] values ignores the terms of the 1994 Agreement.[91]

### 3. Special Agent Coleman Had Access to but Failed to Consider the Healy Memorandum Which Further Negated Any Criminal Intent

In order to show probable cause that the Apartment Proceeds were proceeds of a crime and thus properly subject to seizure, the Coleman Affidavit had to show probable cause that Mr. Black *knew* that what he said was false or that he knowingly acted improperly or made, or caused to be made, false representations regarding the fairness of his purchase of the Manhattan Apartment.  *See United States v. Morris*, 80 F.3d 1151, 1160-61 (7th Cir. 1996); *Emery v. American Gen. Fin., Inc.*, 71 F.3d 1343, 1346, 1348 (7th Cir. 1995); *United States v. Turner*, 551 F.3d 657, 664 (7th Cir. 2008) (To convict a defendant of wire fraud, the Government must prove three elements, including the defendant's intent to defraud). No such evidence exists; nor did it exist at the time the Coleman Affidavit was filed.  Indeed, exculpatory evidence existed in the form of the Healy Memorandum.  Paul Healy, an employee of Hollinger, had been tasked by one of Mr. Black's co-defendants, Jack Boultbee, with verifying the market price of the Manhattan Apartment with real estate brokers.  At the direction of Mr. Boultbee, Mr. Healy prepared the Healy Memorandum, which was on file with Hollinger and available for Special Agent Coleman to examine.  In the Healy Memorandum, Mr. Healy represented that he had spoken with a number of brokers and that the purchase price projected in the 2000 Transfer Agreement was appropriate.[92]

---

[90] An additional infirmity in the Affidavit's use of "market" value comparisons is that the Affidavit valued condominiums when the apartment in question was a cooperative.

[91] *See* Powers Affidavit Exhibit 1 at ¶ 11.

[92] *See* Powers Affidavit Exhibit 23.

Three men – Mr. Black, Mr. Boultbee and Mr. Healy – had firsthand knowledge of the circumstances of the transaction the Government wished to prove fraudulent. At the time the Affidavit was sworn, *the Government had not spoken about this issue to any of them*. This was the case despite months of lead time between the initial contact between the Skadden attorney representing the buyers and the prosecutors. ██████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████[93]

It is clear that the Healy Memorandum was on file with Hollinger and hence available to the Government as it was considering whether to seize the Apartment Proceeds. Special Agent Coleman either read the Healy Memorandum, in which case he was aware that Mr. Black had been informed that the agreed-upon price was fair, thus negating criminal intent on the part of Mr. Black, or he did not read Mr. Healy's memorandum, in which case Special Agent Coleman could not give evidence on the pricing the parties agreed to in the 2000 Transfer Agreement. Either way, the Government failed to consider evidence that tended to negate any criminal intent by Mr. Black.

    4. <u>Flawed Calculations Led to the Restraint of Far More Money Than Authorized by Statute</u>

Even if the Coleman Affidavit had not contained the material misrepresentations and omissions described above, the amount actually seized was far in excess of the amount authorized by statute, and a Fourth Amendment violation. In total, the Government seized

---

[93] *See* Powers Affidavit Exhibit 26 at USA_002254; Powers Affidavit Exhibits 27-29.

$8,928,867.[94]   Even assuming that Special Agent Coleman's erroneous analysis correctly concluded that the "fair market value" of the Manhattan Apartment in 2000 was $5.4 million, and that Mr. Black should have purchased the Manhattan Apartment in 2000 at that price, the Government's seizure of nearly $9 million was so excessive and unsupported by law that it amounts to an independent Fourth Amendment violation.

The traceability of proceeds of a crime is restricted in cases where the specific unlawful activity is the manner of exchange for otherwise "lawful goods or lawful services." 18 U.S.C. § 981(a)(2)(B)(2006).  "Proceeds" of such exchanges are "the amount of money acquired through the illegal transactions resulting in the forfeiture, *less the direct costs incurred* in providing the goods or services." *Id*. (emphasis added). These "direct costs," the legitimate expenses attached to the transaction and otherwise untouched by the alleged wrongdoing, therefore, are not subject to seizure. *Id*.  Courts in this Circuit have repeatedly held that the Government's reach does not extend to these legitimate assets, as "forfeiture was 'designed to force criminals to disgorge their ill-gotten gains.'" *United States v. 122,942 Shares of Common Stock of Firstrock Bancorp, Inc.*, 847 F. Supp. 105, 108 (N.D. Ill. 1994) (citation omitted) (finding that the court could not require

---

[94] Of the two pieces of property the Affidavit identifies for seizure, only one – the balance of the moneys due at closing – bears any resemblance to Special Agent Coleman's description.  *See* Powers Affidavit Exhibit 1 at ¶ 2.  The other, Mr. Black's Contract Deposit in the amount of $1,020,000, is identified as being held in "an account named Attorney Escrow Account for Lord Conrad Black at Citibank, N.A. in New York, New York."  *Id.*  In reality, the account bears a different number, and is far from being dedicated to Mr. Black's funds alone, the account, titled "Sullivan & Cromwell Attorney Trust Account," was presumably used just as its name indicates – as a repository for the fees and retainers for all of Sullivan & Cromwell's clients.  *See* Powers Affidavit Exhibit 37.  Special Agent Coleman presented Magistrate Judge Mason with an account allegedly containing funds relating to Petitioner alone, when in reality he was requesting that the Court seize an account containing monies belonging to many clients of one of the larger and more respected law firms in the nation.  Such a discrepancy begs the question of how receptive a federal judge would have been to a request for a warrant containing a more accurate description, especially given that non-traceable proceeds pooled with untainted funds could not be touched. *See U.S. Currency*, 176 F.3d. at 946.

forfeiture of the money paid to purchase stocks bought through illegal purchase agreements in addition to the allegedly lawful profits); *see also United States v. Masters*, 924 F.2d 1362, 1369-70 (7th Cir. 1991) (holding that "proceeds" for the purposes of the statute "are net, not gross, revenues – profits, not sales, for only the former are gains").

Under 18 U.S.C. § 981(a)(2)(B), the Government was only entitled to seize, *at most*, the difference between the $3 million sales price and Special Agent Coleman's idea of the "fair market value" of the Manhattan Apartment, which would exclude the "direct costs" sustained by Mr. Black in the course of its purchase. Even using the numbers most favorable to the Government in the Coleman Affidavit, the maximum amount the Government could have seized was $2.55 million, not the nearly $9 million that was actually taken.[95] The difference between $2.55 million and $9 million would have been sufficient for Mr. Black to retain counsel of choice – as Williams & Connolly pointed out prior to the indictment.

**C.**   **The Material Misstatements and Omissions in the Coleman Affidavit Deprived Mr. Black of his Fourth Amendment Right Not to Be Deprived of Property Absent Probable Cause**

This is not a case where omissions or misrepresentations could properly be excused as mere negligence or a thoughtless error due to time constraints. Here, the "actual inaccuracies are or should be within [the investigator's] knowledge." *United States v. Harrison*, 400 F. Supp. 2d 780, 787 (E.D. Pa. 2005). Special Agent Coleman referred repeatedly to the 1994 Agreement and the 2000 Transfer Agreement, but chose simultaneously to ignore the exculpatory facts in

---

[95] Using the figures in the Coleman Affidavit most favorable to the Government (and ignoring Mr. Black's forgiveness of $4.6 million of debt), Mr. Black paid $2.15 million in cash and transferred his interest in the Ground Floor Apartment. *See* Powers Affidavit Exhibit 22 at ¶ l. The Coleman Affidavit estimated a range of $700,000 to $800,000 for the value of the Ground Floor Apartment. *See* Powers Affidavit Exhibit 1 at ¶ 16. If one were to assume that Mr. Black should have paid $5.4 million for the Manhattan Apartment when he bought it in 2000, the Government would only be entitled to seize, at most, $5.4 million less $2.15 million (cash) and less $700,000 (the low estimate of value of Ground Floor Apartment), or $2.55 million.

these documents, to rely only on portions of the documents that supported the Government's view, and to omit to attach the two agreements that contradict his application from the papers given to the Magistrate on an unnecessarily belated and rushed application.  Likewise, Mr. Healy and the memorandum he authored which countered the Government's theory were also omitted from the Government's analysis.  The Court, lacking the benefit of this evidence, was prevented from making an informed probable cause assessment.  The omitted evidence was "clearly critical" to the probable cause determination, and its omission, if not deliberate, was reckless in the extreme.  *Jenkins*, 16 Fed. App'x. at 67.  The 1994 Agreement, 2000 Transfer Agreement, and the Healy Memorandum were contrary evidence to the Government's claim that Mr. Black intended to defraud Hollinger.  This is exactly the type of evidence the existence of which "any reasonable person would have known that this was the kind of thing the judge would wish to know."  *Wilson*, 212 F.3d at 788 (citation omitted).

Moreover, where errors and omissions made in haste can sometimes be excused in circumstances where additional verification and an expanded analysis are not possible, such was not the case here.  *See United States v. Lowe*, 516 F.3d 580, 584-85 (7th Cir. 2008).  There was no last minute change in circumstances or rush to the courthouse.  The Government had been exchanging information with counsel for the buyers of the Manhattan Apartment for more than a month before the seizure and had evidently conducted a sufficient investigation to conclude that the buyers were "bona fide purchasers for value."[96]

Indeed, the Government decided to lay a course to seize the Apartment Proceeds without notice to Mr. Black.  Although the Government had met with Mr. Black's counsel before the seizures, it decided not to inform his counsel of its covert plans to seize the Apartment Proceeds.

---

[96] *See* Powers Affidavit Exhibit 6.

As this Court has found, even after the intensive fact-finding attendant on a lengthy jury trial, the Government never established any legitimate claim to Mr. Black's assets.[97]  While the Government argued that Petitioner and his co-defendants had used funds fraudulently obtained from Hollinger "to cover expenses and improvements in both specified properties," this Court agreed with Mr. Black that the Government had "not demonstrated that this specific property [was] forfeitable."[98]  Indeed, this Court observed that the Government did not even "attempt to trace these expenditures to any of the fraud proceeds,"[99] and thus "[had] not proven [its case] by a preponderance" with regard to its claims on the Apartment Proceeds.[100]  This failure only serves to further illustrate the unjustifiable nature of the seizure of the Apartment Proceeds.

The seizure warrants and the resultant seizure of nearly $9 million violated the Fourth Amendment because they lacked probable cause and seized property far in excess of the amounts authorized by statute.  The warrants were issued based solely on the Coleman Affidavit which contained material misstatements and omissions of exculpatory facts that, due to their number and nature, could only have been made intentionally or recklessly.  Because the Coleman Affidavit created the appearance of probable cause through false statements, concealment of the underlying evidence, and omissions of fact that were made either recklessly or intentionally, the seizure of the Apartment Proceeds violated Mr. Black's Fourth and Fifth Amendment rights.

---

[97] *See* Powers Affidavit Exhibit 2 at 30-31.

[98] *Id.* at 26-27.

[99] *Id.* at 27.

[100] *Id.* at 31.

IV.     **THE GOVERNMENT'S CONDUCT FROM SEIZURE TO INDICTMENT DEPRIVED MR. BLACK OF HIS FIFTH AMENDMENT RIGHT TO DUE PROCESS OF LAW**

The Government intentionally deprived Conrad Black of the funds he needed to retain Williams & Connolly as his counsel. As discussed above, the legal question of whether that conduct is lawful or unlawful depends substantially on whether the Government had the right to forfeit the proceeds of the sale of Mr. Black's Manhattan Apartment. If the forfeiture was justified, then the proceeds are not available to hire counsel. But if the forfeiture claim is ill-based, or as in this case, wholly unfounded, a different result exists. The Government conduct cannot, as it did, intentionally and unjustifiably deprive a defendant of property and of the right to counsel of his choice.

In *United States v. Monsanto*, upholding the forfeiture laws in the face of a Sixth Amendment challenge, the Court rejected a Sixth Amendment challenge based on the pretrial restraint of funds required for the payment of legal fees to counsel of choice under drug forfeiture statutes. 491 U.S. at 616. However, the *Monsanto* Court specifically denoted that such pretrial restraint of funds for the payment of legal fees is permissible only upon an adequate finding of probable cause; the holding did not extend to Sixth Amendment violations caused by inherently *invalid* probable cause determinations. *Id.* The Supreme Court also noted that it did not reach the issue of whether Due Process required a pretrial hearing to review probable cause before a pretrial restraint of such assets, as in that case such a hearing had been held, indicating that the Due Process analysis might change based on the lack of probable cause review available prior to trial. *Id.* at 615 n.10.

Similarly, in *Caplin & Drysdale Chartered v. United States*, the Supreme Court contemplated a similar situation in relation to attorneys fees. 491 U.S. at 626. In *Caplin*, the attorney for a man accused of drug violations sued to recover fees forfeited from an attorney

escrow account which had been seized after his client's partial guilty plea to certain counts authorizing forfeiture. *Id.* at 621. The attorney argued that the forfeiture statute at issue, 21 U.S.C. § 853, impermissibly violated due process and the Sixth Amendment right to counsel by allowing for the seizure of legal fees and giving the Government the opportunity to deprive a defendant of the counsel of his choice. *Id.* at 623-24. The Supreme Court denied both claims. The Court held that the "Constitution does not forbid the imposition of an *otherwise permissible* criminal sanction, such as forfeiture, merely because in some cases prosecutors may abuse the processes available to them." *Id.* at 634 (emphasis added). However, while the Court was unreceptive to a challenge based on the *possibility* of abuse by overzealous prosecutors, the Court plainly distinguished the occurrence of *actual* abuse:

> Forfeiture provisions are powerful weapons in the war on crime; like any such weapons, their impact can be devastating when used unjustly. But due process claims alleging such abuses are cognizable *only in specific cases of prosecutorial misconduct* (and petitioner has made no such allegation here) or when directed to a rule that is inherently unconstitutional.

*Id.* (emphasis added). The Court thereby indicated that Sixth Amendment claims remained viable in the forfeiture context where violations of Fifth Amendment Due Process led to the forfeiture itself. Mr. Black is making precisely the claim of prosecutorial misconduct to which the Court referred.

The Eleventh Circuit, in an opinion predating the *Caplin & Drysdale* and *Monsanto* decisions, expounded its view of prosecutorial abuse of the forfeiture provisions thusly:

> If the defendant proves at trial or in a collateral proceeding that prosecutors, acting in bad faith, restrained assets which they knew or should have known to have no connection with criminal activity, a conviction would be in great jeopardy due to a denial of the Sixth Amendment right to counsel of choice.

*United States v. Bissell*, 866 F.2d 1343, 1355 (11th Cir. 1989) (*referencing United States el rel. Ferenc v. Brierley*, 320 F. Supp. 406 (E.D. Pa. 1970) (granting writ of habeas corpus where

Government failed to return seized money that was not alleged to have been involved with the offense charged)).  In *Bissell*, similar to the later *Monsanto* and *Caplin* cases, defendants accused of drug crimes challenged the pretrial restraint of assets intended for payment of their lawyers on Due Process and Sixth Amendment grounds.  *Id.* at 1350.  The *Bissell* Court examined the Due Process implications of prosecutorial misconduct with regard to forfeiture of potential legal fees and noted that the availability of pretrial restraint amounted to "an opportunity for prosecutorial abuse."  *Id.* at 1354.  Although the *Bissell* Court ultimately held that there had been no Sixth Amendment violation, it noted that "no prosecutorial bad faith[was] evident" in the case and indicated that its holding would be vulnerable had the situation been otherwise.  *Id.* at 1355.

The District Court in *Stein I* also recognized the Fifth Amendment implications of improper Government interference in the retention of counsel of choice.  As discussed *supra*, the *Stein* defendants' employer had a standing policy to provide payment of its employees legal fees, which it abandoned after pressure by the USAO.  435 F. Supp. 2d at 350.  The *Stein I* court found violations of both the Sixth and Fifth Amendments:  the Sixth in the ultimate denial of counsel of choice due to the improper barrier to the defendants' available funds, and the Fifth in the fundamental unfairness of the Government's tactics.  *Id.* at 362.  *Stein I* does not stand for the proposition that a criminal defendant has "a constitutional right to the most expensive lawyer or to unlimited defense funds," but rather that "government interference with those resources that a defendant does have or legally might obtain fundamentally alters the structure of the adversary process."  *Id.* at 372.  *Stein I* recognized the "fundamental" right of a criminal defendant "to obtain and use in order to prepare a defense resources lawfully available to him or her, free of knowing or reckless government interference."  *Id.* at 361-62.

51

The *Stein I* court held that the USAO and Department of Justice policy violated the Due Process clause because it was not narrowly tailored to achieve a compelling Government interest. *Id.* at 364-65. Though the Government may have had an interest in preventing companies from paying legal fees as part of a continuing scheme, the governmental policy at issue broadly interfered with the ability of defendants to retain counsel of choice even where no such scheme existed. *Id.* As the court noted "the government may not both prosecute a defendant and then seek to influence the manner in which he or she defends the case." *Id.* at 357.

*Bissell* and *Stein* illustrate that deprivations occurring through combinations of Fourth and Fifth Amendment violations by the Government may give rise to Sixth Amendment concerns where prosecutorial misconduct results in the pretrial restraint of fees intended for a defendant's attorney of choice. As noted *supra* in section II, the Sixth Amendment violation at the core of this case was grounded in multiple and substantial underlying violations of Fourth and Fifth Amendments carried out by the Government's agents and attorneys. As discussed *supra* in section III, the initial seizure of funds in this case was accomplished through two seizure warrants which, due to material omissions and misstatements of fact, were issued based on Government misconduct that resulted in presenting Magistrate Judge Mason with an Affidavit containing knowingly or recklessly false and deceptive statements that created the appearance of probable cause in violation of the Fourth Amendment. Though the Government was aware of the omissions and misstatements of fact at the heart of the Coleman Affidavit, at no time did its agents or attorneys make any effort to correct them. Rather, it permitted the Court issuing and reviewing the warrant to labor under a misapprehension of these material facts, then used the Court's misapprehension to its advantage at the cost of Mr. Black's constitutionally-guaranteed right to counsel of choice.



The failures underlying the seizure warrants were only the beginning of the Government misconduct toward Mr. Black's case. ███████████████████████████████████████

The Government thereafter was faced with two options: (1) proceed with a forfeiture-free indictment and face Williams & Connolly or (2) tack on unsupported mail fraud and forfeiture counts to their planned indictment, relying on the legal fact that the allegations would be unreviewable, and improperly prevent Mr. Black from having access to the seized funds until after Williams & Connolly had withdrawn.

---

[101] The Local Rules under which attorneys in the Northern District of Illinois must operate specify that any lawyer before the court, including a prosecutor, shall not "advance a claim or defense the lawyer knows is unwarranted under existing law" unless they have a good faith basis for arguing for a change in the law's application. N.D. Ill. L.R. 83.51.2(f)(2) . The Local Rules also provide for special responsibilities for prosecutors, including that a "public prosecutor or other government lawyer shall not institute or cause to be instituted criminal charges when such prosecutor or lawyer knows or reasonably should know that the charges are not supported by probable cause." *Id.* at LR. 83.53.8.

The Government chose the latter, striking a foul blow. The Government intentionally filed an invalid indictment to bar any avenue by which Mr. Black could recover his improperly seized funds, or indeed even challenge the seizures, until after trial. Filing unsupported charges generated no value for the Government's case other than successfully barring Mr. Black access to his funds and, consequently, his desired counsel. As such, these actions amounted to prosecutorial misconduct to deprive Mr. Black of his property and rights without due process of law in violation of the Fifth Amendment. Prosecutors are not permitted to file a criminal charge which they know is baseless, but that is what they did.[102]

Assuming that Agent Coleman and AUSAs Kent and Sussman thought they were merely playing "hardball," they did not adequately consider whether they had any legal, constitutional basis for restraining a defendant's assets for the purpose of denying him counsel of his choice. Their view that Mr. Black was guilty—in the absence of evidence—does not replace his constitutional rights to counsel of his choice.

**B.** **The Government Wrongfully Neglected to Correct Material Omissions and Misstatements of Facts Present in the Coleman Affidavit in Violation of its Constitutional Duties Under the Fifth Amendment**

As discussed *supra* in section III, the initial Affidavit submitted by Special Agent Coleman after review by several AUSAs contained multiple and substantial misstatements and omissions of material fact. The Supreme Court has repeatedly held that prosecutors have a duty to disclose information when failure to do so would violate the rights of a criminal defendant. *See, e.g.*, *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Agurs v. United States*, 427 U.S. 97, 110 (1976). Moreover, the prosecutor's duty extends to the investigation of information which may

---

[102] Normally a prosecutor does not want to lose charges, and so does not file losing counts. Here there was a benefit – keeping Mr. Black from hiring his counsel of choice – which outweighed the costs.

damage its own case. The Supreme Court has held that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

A prosecutor must also not present false evidence to the court. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959) (finding a due process violation where a prosecutor failed to correct a witness' false statement that he received no consideration in exchange for his testimony); *accord United States v. Burke*, 425 F.3d 400, 412 (7th Cir. 2005) ("The government's knowing use of false testimony, or failure to correct testimony, violates due process") (citation omitted). Failure to correct false evidence once offered may violate the accused's rights under the Fifth Amendment if it could have affected the outcome of the proceedings. *United States v. Freeman*, No. 07 CR 843, 2009 U.S. Dist. LEXIS 76973, at *32-33 (N.D. Ill. Aug. 26, 2009) (noting prosecutorial duty to correct false testimony and finding prosecutorial misconduct where a prosecutor "attempted not only to use but to bolster [a witness'] false testimony.").

In the case at bar, once the misstatements and omissions present in the Coleman Affidavit were submitted to the Court and resulted in the seizure warrants, they were never corrected by the Government despite multiple occasions where such action was warranted. As in *Napue*, the Government was aware or became aware before filing the indictment that several of the assertions it had offered into evidence were false. ██████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[103] *See* Powers Affidavit Exhibit 27 at 9.

███████████████████████████████████████████████████████

███████████████████████████████████████████████

## C.     <u>The Government Abused the Presumption of Regularity in Filing the Indictment</u>

Rather than disclosing Mr. Healy's statements in time for Williams & Connolly to stay in the case, the Government improperly relied on a presumption of regularity of grand jury proceedings to quash Mr. Black's efforts to employ Williams & Connolly. The Government was twice confronted with papers which outlined the scope of Mr. Black's expenses in refurbishing the Manhattan Apartment – the administrative claim and the moving papers prepared by Williams & Connolly.[104] The Hollinger files *as well as the very documents relied upon in the Coleman Affidavit* corroborated those defense assertions. Instead of amending or correcting the presentation of facts reflected by the Coleman Affidavit to the Magistrate Judge, the Government filed an indictment ████████████████████████████████████████████████████ ████████████ and with no known evidence reflecting any wrongdoing by Mr. Black regarding the sale. Rather than litigate on true facts – and lose – the Government cleverly avoided a probable cause hearing by filing an indictment it knew to contain unsupported charges and forfeiture counts. That conduct, and its perversion of justice, is too clever by half and should be rejected by this Court.

As discussed above, when faced with the knowledge that information submitted in the Coleman Affidavit was plainly false, the only measures taken by the Government were to evade Mr. Black's efforts to seek the return of his funds by filing an unbased indictment.[105] The

---

[104] *See* Powers Affidavit Exhibit 13 at 5.

[105] The relevant provisions of the Northern District of Illinois Rules of Professional Conduct forbid all lawyers in all matters from engaging in such conduct, both in regards to the hearing on the motion for the return of the property and in regard to the filing of the indictment. The Rules

prosecutors did not correct the statements contained in the seizure warrants before submitting the matter to a grand jury to secure an indictment. Instead the Government compounded the violation inherent in the warrants and committed prosecutorial misconduct in violation of the Fifth Amendment.

    **D.**     **The Government Committed Misconduct by Strategically Filing an Indictment Against Mr. Black on Unsupported Criminal Charges in Order to Retain his Funds**

As mentioned above, the Government strategically timed its actions in order to foreclose all avenues by which Mr. Black could reclaim the funds prior to trial. The Government did so by planning its seizures when the forfeitable property at issue would be easiest to seize as cash and then retain it. The Government then avoided having a hearing on the seizure by filing an indictment ███████████████████████████████████████████

██████████████████████████. The Government's conduct was in violation of fundamental notions of fairness required of officers of the court and in violation of the duty of prosecutors. The Government's conduct in this case was a foul blow. The Supreme Court has continually recognized a duty of "fundamental fairness" in its adversary system, *California v. Trombetta*, 467 U.S. 479, 485 (1984). Therefore, the Government's interest as an adversary in a criminal action:

> is not that it shall win a case, but that justice shall be done. As such, [a prosecutor] is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

---

explicitly state that "in appearing in a professional capacity before a tribunal" if a lawyer "has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures." N.D. Ill. L. R. 83.53.3(a)(4).

*Berger*, 295 U.S. at 88.  In this case, the prosecutors abandoned these notions of fairness and justice in order to weaken Mr. Black's position and defense prior to trial unconstitutionally.

Armed with the opportunity to acquire and keep the Apartment Proceeds with greater ease, the Government next took action to prevent any sort of challenge to the seizures.  When Mr. Black's attorneys commenced an administrative proceeding in order to seek the return of the property, they received no response other than an acknowledgment that the claim had been received.  When counsel attempted to seek redress in the District Court, the Government responded by challenging jurisdiction based on the same stalled administrative proceeding.[106] Essentially, the Government claimed that the Courts were not a proper forum for the return of the seized funds while at the same time precluding any effort to provide an administrative remedy.

However, their efforts could not last forever, as a court briefing schedule was set; ▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ there was a risk that the Magistrate Court might soon review the merits of Mr. Black's claim.  The Government had two permissible options:  justify the seizures in civil court or an administrative proceeding, which would require evidence that they did not have, or return the money prior to trial, which would allow Mr. Black to hire Williams & Connolly.  However, the people acting for the Government chose a third, impermissible option.  They knew that they could evade a losing review of the basis for probable cause by filing criminal forfeiture charges, which would not be reviewable. The Supreme Court has held that where a defendant is convicted upon a finding of guilt beyond a reasonable doubt, "any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt."  *United States v. Mechanik*, 475 U.S. 66, 70 (1986).  They chose that course, relying on the presumption of regularity while intentionally acting in bad faith.  With

---

[106] *See* Powers Affidavit Exhibit 16 at 5.

the hearing scheduled for November 21, the Government filed an indictment on November 17, 2006. In this way, the Government could postpone justifying the seizures and ensure that Williams & Connolly could not be paid their retainer before trial. Such a misapplication of the rules of the judicial system was a violation of Mr. Black's due process rights. The violation of Mr. Black's right was professionally accomplished, and would have been appropriate but for the fact that ███████████████████████████████████

Knowing that as the owner of the property, Mr. Black bore "no burden to show why the seized property should be returned," and that the Government would not be able to meet its own burden in the face of a further challenge, the Government proceeded to present forfeiture charges to the grand jury and cause Mr. Black to be indicted. *Interstate Cigar Co. v. United States*, 928 F.2d 221, 224 (7th Cir. 1991), *see* discussion *supra* in section III. The Government thereby effectively rendered moot any challenge Mr. Black might bring until it was too late to have his funds restored for the purpose of retaining Williams & Connolly for post-indictment representation.[107] While Williams & Connolly did not concede that the seizures were justified, the firm's attorneys acknowledged that they had been procedurally forced out of representing Mr. Black; Williams & Connolly's attorneys withdrew their motion for the return of the seized funds and began the process of withdrawing from their representation.

The Seventh Circuit has previously stated that "the pretrial, postindictment restraint of a defendant's assets without affording the defendant an immediate, postrestraint, adversary hearing at which the government is required to prove the likelihood that the restrained assets are subject to forfeiture violates the due process clause to the extent that it actually impinges on the defendant's qualified sixth amendment right to counsel of choice." *United States v. Moya-*

---

[107] *See* Craig Affidavit at ¶ 19; Sullivan Affidavit at ¶ 14.

*Gomez*, 860 F.2d 706, 731 (7th Cir. 1988). The absence of an adversary hearing at any point in the pre-trial proceedings creates a significant risk of erroneous deprivation. *Id*. at 726-27. *See also United States v. Michelle's Lounge*, 39 F.3d 684 (7th Cir. 1994) (holding that, upon a determination that the Government seized the only funds available to pay criminal defense attorney's fees, "due process requires the government to participate in a post-seizure adversary proceeding on probable cause when the district court has found that the government has seized through civil forfeiture all of the assets a criminal defendant needs to obtain counsel").

Here, the Government used every means available whether permissible or not to prevent any such hearing from occuring and so assumed the risk that the indictment could be dismissed should their conduct come to light and be properly understood. The Government was successful in its efforts, thereby preventing Mr. Black from knowing the inaccuracy of the Affidavit through which his assets were seized and, more importantly, from raising this issue on appeal as it was not part of the trial record. *See United States v. Emor*, 794 F. Supp. 2d 143, 148 (D.D.C. 2011) (denying *Monsanto* pretrial evidentiary hearing on forfeitability where defendant failed to provide any creditable evidence to attribute bad motives to the prosecutors who had reasonable and legitimate grounds for arranging the pretrial seizure of the assets and failed to identify how his efforts to assemble a defense were damaged by the restraint on his assets).

The Government's actions "violate[d] the Constitution or some other rule of positive law" by engaging in tactics designed to secure an indictment in violation of Mr. Black's rights under the Fourth and Fifth Amendments. *In re United States*, 503 F.3d 638, 642 (7th Cir. 2007). Using a faulty Affidavit, timed to limit the Magistrate Court's consideration of the application and to result in ease of seizure, coupled with allegations that were untrue and ultimately disproven to the AUSAs before the filing of the indictment, and following it still by an

indictment based on disproved and untrue assertions of fact, the Government effectively foreclosed any avenue Mr. Black might have to recover his assets in time for trial. In doing so, the Government engaged in prosecutorial misconduct and violated Mr. Black's rights under the Fifth Amendment.

> **E.      This Prosecutorial Misconduct in Violation of the Fifth Amendment Directly Resulted in a Violation of the Sixth Amendment Right to Counsel of Choice**

In the habeas context, a prosecutor's actions must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainright*, 477 U.S. 168, 181 (1986) (citation omitted). As has been established *supra*, prejudice is assumed if a Sixth Amendment violation of denial of counsel of choice is established. *Gonzalez-Lopez*, 548 U.S. at 148. Therefore, where prosecutorial misconduct has created a violation of the Sixth Amendment right to counsel of choice, it follows that the trial has thus been "infected."

This Court must evaluate the cumulative impact that all instances of prosecutorial misconduct had on Mr. Black's right to due process. *See Berger*, 295 U.S. at 89 (reversing because "we have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential"). While the impact at issue here did not occur at time of trial, the duties of a prosecutor are invoked far prior to the trial itself and include a solemn obligation to conduct themselves in a manner that seeks justice rather than simply victory. *Id.*; ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION AND DEFENSE FUNCTION 3-3.2(c) (1993).

Considered as a whole, the misconduct of the Government agents and attorneys in this case rose to the level of egregious violations of the Constitution. "Under the Due Process Clause . . . criminal prosecutions must comport with prevailing notions of fundamental fairness."

*Trombetta*, 467 U.S. at 485.  Fundamental fairness requires that this Court take remedial action following the misconduct by the Government's conduct here.  The Government recklessly or intentionally submitted an Affidavit containing material errors and omissions.  As a result, the funds for Mr. Black to hire his counsel of choice were seized in violation of the Fourth Amendment.  ████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

the Government filed forfeiture counts without probable cause that intentionally deprived Mr. Black of any opportunity for a pretrial hearing to recover funds earmarked for counsel of choice.

The actions of the Government in this case were wholly without legal justification and served no legitimate Government purpose.  Impeding Mr. Black in the course of mounting his defense with the counsel of his choice is not a valid Governmental purpose.  Indeed it erodes the legitimacy of our Government and the United States Constitution which the prosecutors gave an oath they would protect.  Because the Government's misconduct denied Mr. Black his fundamental right to be represented by the counsel of his choice, Mr. Black's two remaining counts of conviction must be vacated and the indictment dismissed.

## V.    PRAYER FOR RELIEF / CONCLUSION

For the reasons stated herein, Mr. Black's conviction is constitutionally-unsound, in violation of his rights under the Fourth, Fifth, and Sixth Amendments. Mr. Black requests that this Court grant his motion for relief under 28 U.S.C. § 2255 or, in the alternative, for a writ of error *coram nobis* to issue, vacating the conviction and sentence previously imposed and dismissing the indictment against him.

---

108 ████████████████████████████████████████████

██████████████████████████

It is too late to turn back the clock and to restore the deprivation of Mr. Black's Constitutionally-guaranteed right to counsel of choice. However, it is not too late for Mr. Black's remaining convictions to be vacated. This would allow him to defend an ongoing SEC action against him in which he is collaterally-estopped from defending himself because of this improper conviction and would allow him to be able to return to the United States – a country he has admired and defended for all of his adult life and in which his daughter and numerous close friends currently reside. It would also serve to give voice to the principles that the rule of law must be adhered to in every case, no matter who the defendant is or what the prosecution's view of the evidence. Mr. Black comes before this tribunal one more time to ask for redress of what was a major constitutional violation born of the overreaching of certain members of the prosecution team. He does so with an abiding faith that justice may at long last be done.

In the alternative, Mr. Black requests a hearing at which the Government may, if they wish, produce all materials it put in evidence before the grand jury concerning the Apartment Sale, supporting the wire fraud and forfeiture counts. In addition, Mr. Black requests access to all tapes of the grand jury proceedings so that the non-evidentiary portion of the proceedings, including what the prosecutors said to the grand jurors, can be reviewed.

Dated:  June 4, 2012

Respectfully submitted,

CONRAD M. BLACK

By: /s/William K. Kane _____
      One of His Attorneys

Attorneys for Petitioner

William K. Kane
Baker & Hostetler LLP
191 North Wacker Drive, Suite 3100
Chicago, Illinois 60606-1901
Telephone: (312) 416-6200
Facsimile: (312) 416-6201
wkane@bakerlaw.com

Marc D. Powers
John W. Moscow
(*Admissions for Pro Hac Vice pending*)
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201